**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 25, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ADLYNN K. HARTE; ROBERT W. HARTE; J.H., a minor, by and through his parents and next friends, Adlynn K. Harte and Robert W. Harte; L.H., a minor, by and through her parents and next friends, Adlynn K. Harte and Robert W. Harte,

     Plaintiffs - Appellants,

v.

THE BOARD OF COMMISSIONERS OF THE COUNTY OF JOHNSON, KANSAS; FRANK DENNING, Sheriff, in his official and individual capacity; MARK BURNS, deputy, in his individual capacity; EDWARD BLAKE, deputy, in his individual capacity; MICHAEL PFANNENSTIEL, deputy, in his individual capacity; JAMES COSSAIRT, deputy, in his individual capacity; LARRY SHOOP, deputy, in his individual capacity; LUCKY SMITH, deputy, in his individual capacity; CHRISTOPHER FARKES, deputy, in his individual capacity; THOMAS REDDIN, lieutenant, in his individual capacity; TYSON KILBEY, deputy, in his individual capacity; LAURA VRABAC, deputy, in his individual capacity; JIM WINGO, sergeant, Missouri Highway Patrol, in his individual capacity,

     Defendants - Appellees,

and

No. 16-3014

NATE DENTON, deputy, in his individual capacity,

     Defendant.

------------------------------

CATO INSTITUTE; MARIJUANA POLICY PROJECT,

     Amici Curiae.

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:13-CV-02586-JWL)**

_____

Robert M. Bernstein, Bancroft PLLC, Washington, D.C. (Jeffrey M. Harris, Bancroft PLLC, Washington, D.C., Cheryl A. Pilate and Melanie S. Morgan, Morgan Pilate LLC, Kansas City, Missouri, with him on the briefs), for Plaintiff-Appellants.

Lawrence L. Ferree, III (Kirk T. Ridgway and Brett T. Runyon, with him on the brief), Ferree, Bunn, Rundberg & Ridgway, Chtd., Overland Park, Kansas, for Johnson County Defendants-Appellees.

Chris Koster, Attorney General, and Jeremiah Morgan, Deputy Solicitor General, Jefferson City, Missouri, on the brief for Sgt. James Wingo, Defendant-Appellee.

Ilya Shapiro and Randal J. Meyer, Cato Institute, Washington, D.C., filed an amicus curiae brief for Cato Institute.

Kate M. Bell, Marijuana Policy Project, Washington, D.C., and Tejinder Singh, Goldstein & Russell, P.C., Bethesda, Maryland, filed an amicus curiae brief for the Marijuana Policy Project.

_____

Before **LUCERO**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

_____

**PER CURIAM**

_____

2

In this appeal, we affirm in part and reverse in part the district court's grant of summary judgment in favor of the defendants. Although the panel members write separately, each issue has been resolved by a minimum two-judge majority. The disposition of the claims is as follows: We **AFFIRM** the district court's grant of summary judgment on all claims asserted against defendant Jim Wingo. We similarly **AFFIRM** as to the plaintiffs' excessive force and *Monell* liability claims. However, we **REVERSE** the district court's grant of summary judgment on the unlawful search and seizure claims asserted against the remaining defendants. On remand, plaintiffs' claim under *Franks v. Delaware*, 438 U.S. 154 (1978), is limited to their theory that one or more of the remaining defendants lied about the results of the field tests conducted in April 2012 on the tea leaves collected from the plaintiffs' trash. We further **REVERSE** the grant of summary judgment as to the four state-law claims raised on appeal. We **REMAND** these claims to the district court for further proceedings not inconsistent with these opinions.

_____

**LUCERO**, Circuit Judge.

_____

Law-abiding tea drinkers and gardeners beware: One visit to a garden store and some loose tea leaves in your trash may subject you to an early-morning, SWAT-style raid, complete with battering ram, bulletproof vests, and assault rifles. Perhaps the officers will intentionally conduct the terrifying raid while your children are home, and keep the entire family under armed guard for two and a half hours while concerned residents of your quiet, family-oriented neighborhood wonder what nefarious crime you

3

have committed. This is neither hyperbole nor metaphor—it is precisely what happened to the Harte family in the case before us on appeal.

"[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013) (quotations omitted). The defendants in this case caused an unjustified governmental intrusion into the Hartes' home based on nothing more than junk science, an incompetent investigation, and a publicity stunt. The Fourth Amendment does not condone this conduct, and neither can I.

**I**

**A**

On August 9, 2011, Robert Harte and his two children visited the Green Circle Garden Center, a garden store, where they purchased one small bag of supplies. Harte was a stay-at-home dad, attempting to grow tomatoes and other vegetables in his basement as an educational project with his 13-year-old son. Unbeknownst to Harte, Sergeant James Wingo of the Missouri State Highway Patrol was parked nearby in an unmarked car, watching the store as part of a 'pet project.' Wingo would often spend three or four hours per day surveilling the garden store, keeping meticulous notes on all of the customers: their sex, age, vehicle description, license plate number, and what they purchased. On this particular day, Wingo observed Harte's visit and recorded the details in his spreadsheet.

4

More than five months later, Thomas Reddin, a sergeant in the Johnson County Sheriff's Office ("JCSO"), emailed Wingo about the possibility of conducting a joint operation on April 20, 2012. The idea stemmed from a multi-agency raid on indoor marijuana growers that was conducted on the same date the previous year. That raid, known as "Operation Constant Gardener," was spearheaded by Wingo on the basis of several hundred tips he had amassed from his garden store surveillance. Wingo chose April 20 because he understood that date to be "Christmas Day" for marijuana users. Approximately thirty law enforcement agencies participated in the 2011 operation, including the JCSO. Although the operation yielded some success, it also resulted in the search of at least one home containing nothing but tomato plants, which became a running joke amongst the agencies.

When asked by Reddin about a second Operation Constant Gardener in 2012, Wingo replied that he "[didn't] really have enough new contacts to justify a full throttle 420 operation." He offered to share the names he did have, although he was not planning to participate in any raid himself. On March 20, 2012, Wingo sent Reddin a list of names, including Harte's, from the garden store surveillance. Thus, <u>over seven months</u> after Harte made his single, innocent trip to a garden store with his children, he became a criminal suspect in the JCSO's marijuana grow investigation.

Undeterred by the limited pool of suspects provided by Wingo, Reddin was determined to "at least mak[e] a day of it," even if the Missouri Highway Patrol was not going to conduct a "full blown" operation. Despite not yet having probable cause for search warrants, and with only four weeks to investigate, the JCSO began planning a

5

press conference to celebrate the success of their operation. The pressure was on for JCSO officers to find probable cause by April 20.

**B**

Robert Harte was and is married to Adlynn Harte. Mrs. Harte did not accompany her husband on his visit to the garden store, and we are told nothing about why she was a suspect. The "investigation" of the Hartes was nominal at best: Despite believing the Hartes had a marijuana grow operation somewhere in their home, the JCSO did not conduct surveillance, check utility records, look for fans or other alterations typically used to conceal grow operations, or notice the tomato garden readily visible through a front-facing basement window. There is also no evidence, aside from the apparent discovery of a traffic ticket, that anyone at the JCSO even conducted a background check on the Harte family. If they had, the record tells us that they would have learned that Robert and Adlynn Harte were both former CIA employees with the highest level of security clearance; Mrs. Harte worked as an attorney at Waddell and Reed Financial and was a graduate of the Leawood Citizens Police Academy; her brother was also an attorney, formerly for the Navy JAG Corps, and an ex-New York City police officer trainee; the Hartes had a son in seventh grade and a daughter in kindergarten; and they had no criminal record other than the aforementioned undesignated traffic ticket.

Instead, the entirety of the JCSO's investigation of the Hartes consisted of three "trash pulls." On April 3, 2012, Deputies Mark Burns and Edward Blake found wet green vegetation mixed in with the Hartes' kitchen trash. They determined it was not suspicious. Burns found the same wet green vegetation when he returned to the Hartes'

6

home with Deputy Nate Denton on April 10, 2012. This time, with only ten days before JCSO's planned press conference on the success of its April 20 raid, the previously innocuous vegetation was considered to be wet marijuana plant material. Burns asserts that he field tested the plant material found on April 10 using a Lynn Peavey KN reagent test kit, and that it was positive for marijuana. However, there is no record of that test because, although Burns thought it good practice to photograph the results of field tests and had done so in other situations in the past, he did not take pictures of the plant material or the KN reagent test results. The deputies needed one more positive trash pull before they could seek a warrant. So, on April 17—with only three days before the pre-planned raid—Burns and Blake conducted one final trash pull from which they found the same green vegetation. They claim that vegetation field tested positive for marijuana, but once again, the officers did not photograph this crucial evidence.

With nothing more than Harte's one trip to the garden store over eight months earlier and two allegedly positive field tests, the JCSO went straight for a search warrant. The directions for use of the test clearly provide "that these tests are only presumptive in nature" and "will give you probable cause to take the sample in to a qualified crime laboratory for definitive analysis." Officers opted against sending the vegetation to a lab for confirmation, despite having the ability to do so. Had the officers taken that extra step, they would have saved the Hartes a traumatic and invasive experience and themselves the embarrassment of a botched investigation. The "marijuana," officers would soon learn, was nothing more than loose-leaf Teavana tea.

**C**

7

As if the botched investigation were not enough, the JCSO subsequently executed an excessive, SWAT-style raid. The officers did not consider it a high-risk entry, yet Lieutenant Mike Pfannenstiel dispatched a team of seven officers to the Hartes' home on the morning of April 20. Even more concerning, the officers timed the raid for when the Hartes' children would be home but failed to create any safety plan in anticipation of risks to the children.

At approximately 7:30 a.m., the seven JCSO officers, clad in "black swat-type uniforms" and brandishing .9 millimeter Glocks, an AR-15 assault rifle, and a battering ram, approached the Hartes' house. Harte heard pounding on the door and opened it to find an apparent tactical team ready to storm the house. Mrs. Harte recalled hearing "screaming and loud banging, so hard that the walls were rattling and it sounded as though our front door was coming off the hinges." She ran down the stairs to find a team of officers flooding the foyer, shouting at her to put her hands behind her head, and Harte lying face-down and shirtless, an officer holding an assault rifle over him.

The Hartes were kept under armed guard on the family's couch as the officers carried out a search of the home. In the first 15 to 20 minutes of their search, they discovered nothing more than what had been in plain view all along: a tomato garden. Yet, despite this strong evidence that the Hartes were not concealing a marijuana grow in their home, the officers continued their search for two and a half hours, even bringing in a drug-sniffing dog after over an hour of searching proved fruitless. Throughout this entire period, the Hartes were not permitted to leave, even though there were no charges against

8

them. The officers went so far as to refuse a concerned neighbor's request to remove the children from the home during the search.[1]

When Reddin was informed that the two-and-a-half-hour, seven-man raid yielded nothing but tomato plants, he was furious. "You're lying to me," he said to Deputy Larry Shoop when Shoop reported the news, later writing "SON-OF-A-BITCH!!!" in an email to Lieutenant Pfannenstiel, who responded, "Nothing?????????????????????" After learning that the drug raids were not going well, Sheriff Frank Denning attempted to cancel the pre-planned press conference. But notice of the conference had already been sent, so Denning reluctantly proceeded. The subsequent news coverage, which featured pre-recorded video footage of Denning and marijuana plants purportedly confiscated during the raids, suggested a successful operation across Johnson County, even though no live plants had been seized that day. Notably absent from the news reports was any mention of the law-abiding family wrongfully targeted for their indoor tomato garden.[2]

**II**

We review the grant of summary judgment de novo. Hobbs ex rel. Hobbs v. Zenderman, 579 F.3d 1171, 1179 (10th Cir. 2009). Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the non-moving party, "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether to grant summary judgment

---

[1] In his deposition, James Cossairt claims that he remembers asking the Hartes if they needed to take the kids to school. However, multiple pieces of evidence indicate that no one was free to leave.

[2] Although I have provided a separate recitation of the facts, I adopt in general the facts and procedural history set forth in Judge Phillips' opinion. See Phillips' Op. 2-11.

on qualified immunity grounds, a court must determine:  (1) "whether the plaintiff's allegations, if true, establish a constitutional violation"; and (2) "whether the law was clearly established at the time the alleged violation[] occurred."  Gomes v. Wood, 451 F.3d 1122, 1134 (10th Cir. 2006) (quotation omitted).

The Hartes assert three violations of their Fourth Amendment rights:  (1) an unlawful search, conducted pursuant to a false and misleading search-warrant affidavit; (2) an unlawful seizure; and (3) use of excessive force in carrying out the search.  The Hartes also assert Monell liability against Sheriff Denning and Johnson County in connection with these constitutional violations, as well as related state-law claims.[3] Viewing the facts in a light most favorable to the Hartes, the record is sufficient to support each of these claims and deny defendants qualified immunity.

## A

The Fourth Amendment permits the issuance of search warrants only "upon probable cause, supported by Oath or affirmation."  U.S. Const. amend. IV.  Inherent in this language is "the obvious assumption [ ] that there will be a truthful showing" of facts to support probable cause, meaning that "the information put forth is believed or appropriately accepted by the affiant as true."  Franks v. Delaware, 438 U.S. 154, 164-65 (1978) (quotation omitted).  Thus, if there is substantial evidence to support deliberate falsehood or reckless disregard for the truth, and the exclusion of false statements would undermine the existence of probable cause, a warrant is invalid.  See id. at 171-72.  This

---

[3] The Hartes also brought claims against Wingo for his role in the events leading to the search of their home.  I join in the resolution of those claims as presented in Judge Phillips' opinion.  See Phillips Op. 10 n.7.

10

is equally true when an affiant knowingly or recklessly omits information from an affidavit that would have negated probable cause. Stewart v. Donges, 915 F.2d 572, 582-83 (10th Cir. 1990). "Recklessness may be inferred from omission of facts which are 'clearly critical' to a finding of probable cause." DeLoach v. Bevers, 922 F.2d 618, 622 (10th Cir. 1990). Accordingly, if there is evidence from which a jury could conclude that the officers made intentional or reckless misstatements in their warrant affidavit, or recklessly omitted information "critical" to a probable cause determination, summary judgment is inappropriate. See id. at 622-23. "We have long recognized that it is a jury question in a civil rights suit whether an officer had probable cause." Id. at 623.

The record evidence before us creates a triable issue of fact on whether Burns and Blake lied about having conducted the field tests, or about having obtained "positive" results. The only evidence that the field tests were conducted is the deputies' own testimony and representations in the warrant affidavit; there is no photographic evidence, despite Blake's testimony that he had a camera in hand at the time. The Hartes have presented sufficient evidence to cast doubt on the veracity of the deputies' statements. And while the term "positive" is used by the law enforcement witnesses throughout the record, the test upon which they seek to rely clearly precludes such a conclusion. The face of the package patently provides, "these tests are only presumptive in nature" and "will give you probable cause to take the sample in to a qualified crime laboratory for definitive analysis." Only an analytical lab test as prescribed by the container could yield a final, positive result. The government concedes that the requisite laboratory analysis was not conducted. Q.E.D., there is no evidence of positive test results.

11

Furthermore, the plant matter found on April 10 and 17 was similar to the material collected on April 3. Yet on April 3, it was identified as innocent plant material and discarded without testing. As the April 20 deadline approached, however, it is notable that the officers determined that this previously innocuous material was now suspicious and should be tested for the presence of marijuana. A jury could certainly infer the reason for this about-face was pressure to meet an arbitrary April 20 deadline for manufacturing probable cause.

Defendants were quite candid about the selection of April 20 as a publicity stunt. Emails sent following the 2011 operation discussed ideas for the following year, including "a telethon type billboard with a large green marijuana plant filling up as the pledges come in, making T-Shirts and whatnot." This is too rich for fiction. Messaging about the purpose of the raids was imbued with theatrics: Wingo noted one agency's observation that the raids would make "4/20 . . . something to fear rather than something to celebrate"; and the JCSO's 2012 press release framed the raids as law enforcement's "celebrat[ion] [of] this so-called [marijuana] holiday." Moreover, the JCSO began planning the press conference and drafting public statements touting their success long before officers had even established probable cause to conduct the raids. Adding to the pressure of the 4/20 deadline, the success of this publicity stunt depended on a limited pool of "suspects" from Wingo's garden store surveillance. Wingo himself stated that he did not have enough new contacts to justify a 2012 operation, but Reddin was determined to "at least mak[e] a day of it." The record is mute about a legitimate, law-enforcement rationale for requiring the raids to be conducted on that date.

12

Viewed together, these facts are sufficient to permit a conclusion that the officers fabricated the "positive" field tests. As the judge who issued the warrant indicated, Harte's one trip to the garden store, standing alone, would have been insufficient to establish probable cause. And the officers were under enormous pressure to make the requisite showing in time to carry out the raids on April 20. The evidence presented thus gives rise to a reasonable inference of a classic Franks violation, a law that was clearly established at the time of the officers' conduct in this case. See Clanton v. Cooper, 129 F.3d 1147, 1154 (10th Cir. 1997), overruled on other grounds by Becker v. Kroll, 494 F.3d 904 (10th Cir. 2007); see also Kaul v. Stephan, 83 F.3d 1208, 1213 n.4 (10th Cir. 1996) ("A state officer is not automatically shielded from Section 1983 liability merely because a judicial officer approves a warrant."). It cannot be the case that a jury would be legally obligated to accept the word of a government agent—based on his say-so alone—when that agent had every motive and opportunity to dissemble. Accordingly, the district court erred in granting summary judgment.[4]

**B**

Because there is a genuine dispute of fact regarding the validity of the search warrant, summary judgment as to the Hartes' unlawful seizure claim must also be reversed. If "the search was illegal and not supported by probable cause, the justification for using the search as the foundation for the seizure disappears because it was the connection of the individual with a location suspected of harboring criminal activity that

---

[4] I join Part I.A of Judge Moritz's opinion in full. See Moritz Op. 3-8. And in light of our reversal on the Franks claim, I also join Part II.A, reversing summary judgment on the four state-law claims briefed on appeal. See Moritz Op. 12.

13

provided the reasonable basis for the seizure." Poolaw v. Marcantel, 565 F.3d 721, 732

(10th Cir. 2009) (quotation and brackets omitted); see also Michigan v. Summers, 452

U.S. 692, 703 (1981) ("[A] detention represents only an incremental intrusion on

personal liberty when the search of a home has been authorized by a valid warrant."

(emphasis added)). There was no probable cause at any step of the investigation. Not at

the garden shop, not at the gathering of the tea leaves, and certainly not at the analytical

stage when the officers willfully ignored directions to submit any presumed results to a

laboratory for analysis. Full stop.[5]

## C

The injury to the Hartes' constitutional rights continued through defendants'

execution of the search warrant. The Fourth Amendment requires examination of

whether or not a search and seizure is conducted in a reasonable manner. See Tennessee

v. Garner, 471 U.S. 1, 7-8 (1985). We have previously recognized that "[t]he decision to

deploy a SWAT team to execute a warrant necessarily involves the decision to make an

overwhelming show of force—force far greater than that normally applied in police

encounters with citizens." Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1190

---

[5] Part II.B.1 of Judge Phillips' opinion concludes that the officers violated the Hartes' Fourth Amendment rights by continuing to detain the Hartes and search their home after probable cause had dissipated. See Phillips Op. 30-43. Assuming the officers had probable cause to begin with—a point on which I firmly disagree—I concur that it dissipated the moment the officers knew they would not find a marijuana grow operation. Any further search of the home, or detention of the Hartes, was a violation of the Fourth Amendment. Accordingly, I join in full Part II.B.1 of Judge Phillips' opinion.

(10th Cir. 2001).[6] Thus, Holland clearly established that the decision to deploy a SWAT team in such circumstances is subject to a Fourth Amendment reasonableness analysis. 268 F.3d at 1190. Accordingly,

> [w]here a plaintiff claims that the use of a SWAT team to effect a seizure itself amounted to excessive force, we review the decision to use that degree of force by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."

Id. (quoting Garner, 471 U.S. at 8).

Applying this test, the court in Holland concluded that the decision to use a SWAT team was reasonable, in light of defendants' assertions that: (1) the property owner had a history of violence; (2) there were several other individuals residing on the property who also had histories of violence; (3) the officers suspected there were firearms on the property; (4) the officers thought there might be at least 7-8 adults at the compound; (5) the officers believed the raid was likely to be very dangerous to all persons on scene and were especially concerned about the safety of any children present; and (6) the use of

---

[6] Despite the extreme nature of SWAT-style raids, their use in the execution of run-of-the-mill search warrants has risen at an alarming rate. Police paramilitary deployments increased more than 1,400% between 1980 and 2000, with an estimated 45,000 SWAT-team deployments conducted annually as of 2007. Peter B. Kraska, Militarization and Policing—Its Relevance to 21st Century Police, 1 Policing 501, 507 (2007). Unlike the traditional use of SWAT teams for high-risk, dangerous events such as hostage, sniper, or terrorist situations, over 80% of the deployments in recent years have been for drug-related crimes. Id.

Although the parties agree that defendants did not use a formal "SWAT" team in executing the search warrant, the district court found that the evidence, viewed in a light most favorable to plaintiffs, permitted a conclusion that the officers executing the search warrant constituted a "special unit or team" rather than an ordinary group of patrol officers. Moreover, defendants do not explain why there is any meaningful difference between a formal SWAT team and a SWAT-style or "tactical" team for purposes of an excessive force analysis.

15

a SWAT team was intended to ensure a quick and safe execution of the search warrant and preservation of evidence.  Id. at 1190-91.

None of these facts are present in this case.  Not only did the Hartes lack any history of violent crime, they lacked any criminal history at all.  They were well-respected community members with legal and law-enforcement backgrounds, who had previously been given a high security clearance at the CIA.  The officers also did not have any reason to believe there would be other adults at the home or any additional threats to the officers' safety.[7]  And they have never suggested that destruction of evidence was a concern.  Moreover, there were considerations that should have countenanced against the use of a SWAT team in this instance, including the likely presence of two young children, and the fact that the officers did not consider the search a high-risk entry.[8]

Defendants offer only one argument to justify the deputies' conduct:  they "were serving a felony narcotics warrant with little to no knowledge about the occupants."  But this argument fails in two respects.  First, under Holland, the potential existence of narcotics cannot, by itself, justify the decision to deploy a tactical team to execute a

[7] That firearms were ultimately found during the search of the Hartes' home—carefully secured in a safe—is not relevant because that fact was not relied upon as a justification for the use of force.

[8] Although the officers in Holland also knew children might be present when the raid was conducted, they believed the raid was likely to be very dangerous given that both the property owner and other individuals residing on the compound had violent histories.  They had legitimate reason to be concerned about the children's safety during execution of the raid.  See 268 F.3d at 1190-91.  In contrast, defendants in this case did not consider the raid to be a high-risk entry and have never suggested concern for the children as a justification for deploying a SWAT-style team of officers.

search warrant. To conclude otherwise would swallow the balancing test in its entirety and ignore past precedent, which makes clear that "not every drug investigation" will "pose special risks to officer safety." Richards v. Wisconsin, 520 U.S. 385, 393 (1997) (rejecting a categorical exception to knock-and-announce requirement for searches involving narcotics); see also United States v. Basham, 268 F.3d 1199, 1205 (10th Cir. 2001) (rejecting argument that "because a person is engaged in the drug trade, that person is likely to be dangerous and possess firearms"). The second issue with the deputies' argument is that it relies on their own willful ignorance and failure to conduct an adequate investigation. The use of a SWAT-style raid may not be justified by the unknowns of the search if those unknowns were readily discoverable through simple investigatory tactics, such as running a background check. Cf. Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998) ("[P]olice officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation."); BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986) (stating that "police officer may not close her or his eyes to facts" and that "[r]easonable avenues of investigation must be pursued"). Thus, under clearly established precedent,[9] defendants' use of a SWAT-style raid to execute the search in this instance was plainly unreasonable.[10]

---

[9] The district court and defendants' reliance on Whitewater v. Goss, 192 F. App'x 794 (10th Cir. 2006), is misplaced. As an initial matter, it is an unpublished order and judgment with no precedential value, and it has never been endorsed or cited by this court. More importantly, the court's analysis in that case addressed only a municipal-liability claim asserted against the sheriff for her role in deciding to deploy a SWAT team; the Hartes assert no such claim. See id. at 797-98. Finally, to the extent the

17

Although the above analysis is sufficient to reverse the district court on the Hartes' excessive force claim, another troubling aspect of the search is defendants' treatment of the Hartes' children. I have already called into question the reasonableness of the decision to execute a SWAT-style raid at a time when young children were likely to be present in the home. But the Hartes have also raised a triable issue as to whether the officers unnecessarily prolonged the detention of the children, despite a concerned neighbor's request to remove them from the home.

In considering the reasonableness of a particular use of force, "personal security and individual dignity interests, particularly of non-suspects, should also be considered." Cortez v. McCauley, 478 F.3d 1108, 1131 (10th Cir. 2007) (en banc). These considerations are especially heightened "when the officers' use of force is directed at children . . . ." Maresca v. Bernalillo Cty., 804 F.3d 1301, 1313 (10th Cir. 2015). Mrs. Harte testified that her family was required to sit in their living room under armed guard for two and a half hours, and that it "was clear if we did not comply with every command . . . these officers were prepared to use the multitude of firearms available to them." At no point did officers inform her that she could take her children to school or otherwise remove them from the situation and, as noted, a neighbor's offer to take the children was rebuffed. That the children were permitted to play with toys, use the restroom, and get

majority opinion in Whitewater purports to qualify the Holland balancing test, it does so in plain contradiction to the text of Holland and must be disregarded as erroneous. See id. at 799-801 (Lucero, J., dissenting).

[10] I additionally join Part II.C.1 of Judge Phillips' opinion finding a constitutional violation on this issue. See Phillips Op. 49-53.

18

water does not justify this unreasonably prolonged detention. Cf. Cortez, 478 F.3d at 1131-32 (officers' seizure of plaintiff by escorting her from bedroom in the middle of the night to locked patrol car for an hour was excessive, even though she was permitted to use a phone during her detention).

It is clearly established that officers may "use only as much force as [is] necessary to secure their own safety and maintain the status quo," keeping in mind the safety and dignity interests of non-suspects. Id. at 1131. The officers in this case clearly exceeded that mandate. See Walker v. City of Orem, 451 F.3d 1139, 1149-50 (10th Cir. 2006) (ninety-minute detention of non-suspects, in absence of any exigencies, could not be justified based on investigative rationale or officers' need to control crime scene).

## D

The Hartes assert liability against Sheriff Denning and Johnson County for establishing a policy or custom that caused the misconduct in this case. See generally Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). A government policy or custom is created by "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Id. at 694. The record in this case demonstrates two policies that may serve as the basis for plaintiffs' Monell claim.

The first is the JCSO's investigatory policy under which the targets, deadline, and even success of the April 20 drug raid were pre-determined. As discussed supra, this placed enormous pressure on the deputies to find probable cause in time to make the raid publicity-worthy, thereby creating incentives for the deputies to cut corners and fabricate

19

probable cause.[11]  The Hartes have sufficiently demonstrated both the "requisite degree of culpability" and "a direct causal link between [this policy] and the deprivation of federal rights."  Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997).

The second policy at issue is Sheriff Denning's decision to authorize the use of inconclusive field tests with a high false positive rate, and without the laboratory confirmation expressly required by the manufacturer's label, as the sole basis for probable cause.  The reliability of evidence used to support probable cause is "highly relevant" in determining whether to issue a search warrant.  Illinois v. Gates, 462 U.S. 213, 230, 238 (1983) (stating that informant's reliability is highly relevant to determining value of his report in probable cause analysis); see also United States v. Ludwig, 641 F.3d 1243, 1251 (10th Cir. 2011) ("[I]t surely goes without saying that a drug dog's alert establishes probable cause only if that dog is reliable.").  The field tests used by the JCSO, which are expressly identified by the manufacturer as a preliminary tool requiring laboratory confirmation, do not meet this standard of reliability.  One study found a 70% false positive rate using this field test, with positive results obtained from substances including vanilla, peppermint, ginger, eucalyptus, cinnamon leaf, basil, thyme, lemon grass, lavender, organic oregano, organic spearmint, organic clove, patchouli, ginseng, a strip of newspaper, and even air.  As demonstrated by this litigation, caffeine may now be added to that list.  A 70% false positive rate obviously flunks the reliability test.  Cf. Eaton v. Lexington-Fayette Urban Cty. Gov't, 811 F.3d 819, 822 (6th Cir. 2016)

---

[11] Moreover, following a similar raid on a tomato-grower in 2011, the JCSO was on notice that Wingo's garden-store tips could lead to the targeting of law-abiding citizens.

20

("Procedures that generate results that are not close to 'accurate in the overwhelming majority of cases' may themselves cause testing to be unreasonable in the Fourth Amendment sense." (citation omitted) (quoting Skinner v. Ry. Labor Execs. Ass'n, 489 U.S. 602, 632 n.10 (1989))).

At oral argument, the respondents sought to wrap themselves in the cloak of the Kansas legislature by arguing that Kansas statutes justified their use of field tests. See Kan. Stat. Ann. § 22-2902c; Kan. Admin. Regs. § 10-22-01. The statutes may allow the use of field tests, but implicit in the statutory scheme is a requirement that the use be in accord with the label, and the label here required confirmation by laboratory analysis. There is nothing in the record to suggest the legislature intended that the field tests be used contrary to label, and it would not be within the legislature's power to permit such improper use. Moreover, the regulations require that the field test be "administered by a law enforcement officer trained in the use of such field test by a person certified by the manufacturer of that field test." § 22-2902c(a)(1)(B). Our search of the record to find any evidence of such training has been fruitless. For lack of such connection, the respondents' argument goes nowhere.

By failing to ensure the reliability of the field tests used by the deputies in this case, and by not requiring lab confirmation as a prerequisite for seeking a search warrant, Sheriff Denning and the JCSO allowed deputies to base probable cause on largely inaccurate information. The constitutional violations in this case can be directly attributed to that policy.

21

## III

"[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585 (1980) (quotation omitted). In this case, the Hartes' home was subject to an invasive search as a direct result of a JCSO publicity stunt that lacked any legitimate, law enforcement rationale. Defendants seek to justify their conduct based on Harte's one trip to a garden store and the discovery of loose-leaf tea in the family's trash. Under this standard, the homes of innocent American citizens would be vulnerable to governmental intrusion. Because the police conduct examined here is unacceptable under constitutional standards, I would reverse.

16-3014, *Harte, et al. v. Board of Commissioners of the County of Johnson, et al.*
**PHILLIPS**, Circuit Judge.

The Fourth Amendment guarantees the people the right to be secure in their houses against unreasonable searches and seizures. U.S. Const. amend. IV. When deciding whether a search or seizure is reasonable, we examine whether the totality of the circumstances justified the particular conduct at issue. *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985). In this case, we must decide whether law-enforcement officers who had obtained a search warrant still violated the Fourth Amendment during their extended search of the house of Bob and Addie Harte.

How did a quiet, Kansas family with two young children find itself enmeshed in one Kansas county's "4/20" crackdown on marijuana-grow operations?[1] It began when a Missouri Highway Patrol trooper tipped deputy sheriffs in Johnson County, Kansas that, several months earlier, Mr. Harte had left a hydroponic-gardening store carrying a small bag, accompanied by his young children. Acting on the tip, two deputies searched the Hartes' outside garbage for three consecutive weeks, twice finding a small amount of wet vegetation that they say field-tested positive for marijuana. Based on the field tests, the Johnson County deputies obtained a search warrant for the Hartes' house. Just before 7:30 a.m. on April 20, 2012, after Mr. Harte opened the door in response to their yelling and pounding, seven deputies burst

---

[1] "4/20" refers to April 20, a date commonly associated with marijuana. *See* Appellant's App. at A612–13.

into the Hartes' house with guns drawn, detained all four Harte family members in the living room, and executed the search warrant.

Early in the search, the deputies found a hydroponic tomato-growing operation. Even so, the deputies continued searching the Hartes' home for an extended time, supposedly hoping to find evidence of drug use. After searching high and low for a trace of marijuana, even calling for a drug dog ninety minutes into the search, the deputies found nothing. As it turned out, the two samples of vegetation that the officers had tested three and ten days earlier were brewed, loose-leaf tea.

Asserting claims under 42 U.S.C. § 1983, the Hartes sued Johnson County and all law-enforcement officers involved in the investigation and search, alleging that the search had violated the Hartes' Fourth Amendment right to be secure from unreasonable searches and seizures. They also challenged the search on state-law grounds. In their summary-judgment motions, Defendants asserted qualified–immunity defenses, and the district court ruled in their favor. The Hartes now ask us to vacate the district court's decision.

## BACKGROUND

### I. Operation Constant Gardener

In March 2011, just over a year before the search of the Hartes' house, Trooper Jim Wingo of the Missouri Highway Patrol invited law-enforcement agencies, including the Johnson County Sheriff's Office ("Sheriff's Office"), to participate in "Operation Constant Gardener." Appellant's App. at A667. To agencies expressing interest, Trooper Wingo sent the names of persons that he had seen visiting local

2

hydroponic-gardening stores (more specifically, the car owners listed on the car registrations). Upon receiving those names, the participating agencies investigated (sometimes with trash pulls, checking utility bills, doing knock-and-talks, and even using a lost-puppy ploy credited to Trooper Wingo) and were able to obtain search warrants for some properties. They executed the warrants on April 20, 2011, a date that Trooper Wingo described as the marijuana enthusiasts' version of Christmas.[2] Officers unable to obtain search warrants for other suspected locations did knock-and-talk visits instead of full searches. The 2011 operation uncovered forty indoor marijuana-grow operations and resulted in eight felony arrests. The operation also uncovered at least one "tomato grow." *Id.* at A678.

About a year later, in February 2012, Sergeant Tom Reddin of the Sheriff's Office sent Trooper Wingo an e-mail, asking if Trooper Wingo had gathered enough new information to support another round of "4/20" searches that year. Trooper Wingo responded that he lacked sufficient information to "justify a full throttle [4/20] operation," but on March 20, 2012, he sent Sergeant Reddin another list of car

---

[2] Police and marijuana enthusiasts alike debate how and why April 20 became affiliated with marijuana use, a practice that began as early as 1971. *See* Olivia B. Waxman, *Here's the Real Reason We Associate 420 With Weed*, Time (Apr. 19, 2016), http://time.com/4292844/420-april-20-marijuana-pot-holiday-history/. According to Time Magazine, "420" became code for marijuana because five students in California regularly gathered after school—at 4:20 p.m.—to smoke the drug. *Id.* To evade detection, they referred to their after-school activity simply as "420." *Id.* From there, members and followers of the band The Grateful Dead helped popularize and spread the term as code for marijuana, and encouraged users to partake in it on April 20 at 4:20 p.m. *Id.*

license plates and their registered owners, whom Trooper Wingo surmised had been the visitors he had seen enter the hydroponic stores. *Id.* at A690.

## II. The Investigation

One person on the 2012 list was Bob Harte. On August 9, 2011—eight months before Trooper Wingo sent Sergeant Reddin the list containing Mr. Harte's name—Trooper Wingo had seen Mr. Harte enter a Green Circle store with his children. From his parked patrol car, Trooper Wingo watched Mr. Harte leave the store, carrying a small bag. Trooper Wingo wrote his observations, including Mr. Harte's automobile information, on his spreadsheet. This was the sole time that Trooper Wingo ever saw Mr. Harte at the store.

Once the Sheriff's Office received Trooper Wingo's spreadsheet—and the Hartes' home address in it—Sergeant Reddin told his deputies to investigate the Hartes. In doing so, the deputies never bothered to investigate the Hartes' backgrounds. Instead, in what was apparently common practice, deputies merely collected the Hartes' outside trash on April 3, April 10, and April 17, 2012 to search for evidence of a marijuana-grow operation. On April 3, Deputies Edward Blake and Mark Burns did the first trash pull. They found a small amount of wet, green vegetation dispersed throughout the trash, but they didn't find it suspicious or photograph it.

A week later, on April 10, Deputy Burns again collected the Hartes' outside trash. This time, Deputy Burns found about a cup of green vegetation, which he thought looked like "wet marijuana plant material." Appellant's App. at A700. He

4

noted that he had found "[a] similar quantity of plant material of the same nature" in the Hartes' trash the previous week, but said that he had discarded it because "it was found among other innocent plant material and was misidentified." *Id.* Deputy Burns took no photos of this plant material, but he did note in a report that he had field-tested it and obtained a positive result for tetrahydrocannabinol ("THC"), the active ingredient in marijuana.[3]

A week later, on April 17, Deputies Burns and Blake again collected the Hartes' outside trash. This time, they found about a quarter-cup of green vegetation. In his report, Deputy Blake mentioned that the vegetation had again tested positive for marijuana. Again, nobody photographed the April 10 or April 17 field-test results. Nor did any Sheriff's Office employee send the plant material to the crime lab to be tested before Deputy Burns applied for a search warrant.

Deputy Burns prepared a search-warrant affidavit, relying on his observations of the wet vegetation, the two positive field-test results, and on Trooper Wingo's having seen Mr. Harte leaving the hydroponic-gardening store carrying a small bag. In his affidavit, Deputy Burns swore that the field test used for the April 10 and April 17 plant material "consist[ed] of reagents similar to those utilized by the Johnson County Criminalistics Laboratory to conduct its initial screening test for marijuana," and that it was "presumptive but not conclusive for the presence of marijuana."

---

[3] The Sheriff's Office used a Lynn Peavey field-test kit that used KN reagents—or fast blue B salt—to test for the presence of THC.

Appellant's App. at A708. On April 17, 2012, a few hours after the third trash pull, a state judge issued a search warrant, relying on Deputy Burns's affidavit.

## III. The Search

Lieutenant Mike Pfannenstiel assigned seven deputies to execute the search warrant at the Hartes' house.[4] On April 20, 2012, just before 7:30 a.m., these deputies arrived at the Hartes' house. The deputies timed their arrival early enough to ensure that Mr. and Mrs. Harte would not yet have left for work. At that hour, Mr. and Mrs. Harte were home with their two children, aged thirteen and seven.[5] The deputies wore bulletproof vests and carried guns, and they pounded on the door and screamed for the Hartes to let them in. When Mr. Harte opened the door, the deputies "flooded the foyer" before he could say anything. *Id.* at A104; A132. One deputy carried an AR-15 rifle and the others carried pistols. All had guns drawn and pointed down, in the "low ready" position. *Id.* at A558, A561, A580. Mrs. Harte, roused from bed by the deputies' loud knocking and entry, rushed downstairs and saw armed officers in bulletproof vests "spreading through her house." Appellant's Opening Br. at 16.

---

[4] The team consisted of Sergeant James Cossairt, Deputies Edward Blake, Larry Shoop, Christopher Farkes, Laura Vrabac, and Tyson Kilbey, and Detective Lucky Smith. The Hartes refer to all of the defendants as deputies except for Trooper Wingo and Sheriff Denning, so in this opinion I refer to the team that executed the warrant and all individual defendants on appeal as "the deputies."

[5] Many of the neighbors were also home. One neighbor, Lisa Jameson, saw the deputies approach the Hartes' house with guns drawn and watched as they entered the house. She was frightened, and said that after the search, Mr. Harte seemed very shaken up and humiliated.

6

As one deputy pointed his assault rifle either at or near Mr. Harte, who lay prone on the floor, other deputies ordered Mrs. Harte and the Hartes' two young children to sit cross-legged against the wall. The deputies then moved the Hartes to the living-room couch, and an armed deputy monitored them during the search. Mrs. Harte asked for permission to leave, but a deputy told her she couldn't (the deputies claim that if anyone had asked to leave, they could have done so).[6] The deputies let the Hartes and their children use the bathroom, make phone calls, and play video games. Deputy Blake asked the Hartes questions, but didn't press them when the Hartes said they didn't want to talk.

The deputies searched the house for about two-and-a-half hours even though they quickly discovered that the Hartes were using their hydroponic-grow operation to grow tomatoes and vegetables. After about ninety minutes, and after the house had been thoroughly searched, a couple of deputies claimed to have smelled a "faint odor of marijuana . . . at various places in the residence," and called for a drug dog. *Appellant's App.* at A177–78. But the dog didn't alert, and his handler never noticed a smell of marijuana. After the search flopped, the deputies in parting told the Hartes the family should sit down and talk about drug use. The deputies "strongly suggested" that the Hartes' thirteen-year-old son was a drug user, and recommended that they "take [their] son to a pediatrician for an anonymous drug test," and "have a

---

[6] In her affidavit, Lisa Jameson also stated that she approached a deputy and asked him if she could take the Hartes' children to school. The deputy reportedly said no, and told her that the children were fine.

family meeting to try and discuss the problems" they had in their family. *Id.* at A731; Appellee Sheriff's Office's App. at JCSA458.

## IV.    The Aftermath

That afternoon, the Sheriff's Office issued a press release and held a press conference, even though Sheriff Denning had tried to cancel it because the April 20, 2012 searches had uncovered no marijuana grows. Despite the day's failures, Sheriff Denning still spoke to television reporters in front of a pile of marijuana plants while warning about the dangers of marijuana. Privately, the Sheriff's Office was disappointed with the operation's results, and lamented its failure. Worse yet, the Sheriff's Office later learned that the green vegetation from the Hartes' outside trash was not marijuana, but instead brewed, loose-leaf tea. The deputies had used the Lynn Peavey KN-reagent field test on the tea, and obtained two false-positive results.

The Hartes immediately complained to the Sheriff's Office about the search, and, unsatisfied with the response, requested records related to the investigation. About four months after the search, and after the district attorney's office told the Sheriff's Office that the Hartes had complained about the search, Deputy Blake submitted the vegetation found in the Hartes' trash to the county's crime lab. Using the same brand and type of field test used by the deputies, the crime lab determined that there "was a peak for caffeine in the sample." Appellant's App. at A198. A lab technician tested both tea samples from the Hartes' trash and got two false-positive results. But according to the technician, the leaves didn't "appear to be marijuana" to

8

the naked eye, and under the microscope they didn't "look anything like marijuana leaves or stems." *Id.*

The Hartes retained their own expert to test four kinds of Teavana-brand, loose-leaf tea, the brand that Mrs. Harte had brewed in April 2012. For each test, the expert brewed the tea samples and then tested them on the same day. The expert used three different field tests: one was the exact brand and type of test that the deputies had used, the KN Reagent Lynn Peavey Marijuana QuickCheck Pouch. The second was a different test by the same manufacturer but with different reagents, the D-L Reagent Lynn Peavey Marijuana QuickCheck Pouch. And the third was a test by a different manufacturer using the same reagents as the test the deputies had used, the NarcoPouch Marijuana Test Kit #909 by ODV.

Using the KN-Reagent Marijuana QuickCheck test from Lynn Peavey, the expert obtained four negative results. With the Lynn Peavey D-L test, one of the teas falsely tested positive, two tested negative, and one sample wasn't tested. Finally, using the NarcoPouch with the KN Reagent, the expert obtained three negative results, and didn't test one sample. So just once did any of the brewed tea leaves test positive for marijuana.

While all this was happening, Lieutenant Pfannenstiel reached out to Doug Peavey, the president of Lynn Peavey, the manufacturer of the KN field test that the Sheriff's Office had been using to test for marijuana. Doug Peavey told Lieutenant Pfannenstiel that the KN-reagent test "is primarily only used in the UK and Europe." *Id.* at A202. But Peavey confirmed that the KN test reacts with THC, and reminded

9

the Lieutenant that "you guys in particular have had some successes in the past with KN and testing for [synthetic marijuana]." *Id.* Concerned about the e-mail, Captain Douglas Baker told his team to stop using the KN-reagent test and to use the D-L test instead. The Johnson County crime lab agreed that the KN-reagent test was the wrong field-test kit to use to test for marijuana, and recommended sending potential evidence to the crime lab in addition to field-testing it.

## V.    The District Court Case

In November 2013, asserting claims under 42 U.S.C. § 1983, the Hartes sued Johnson County, Sheriff Denning, Trooper Wingo,[7] and several Johnson County deputies. The Hartes alleged that the deputies had violated their Fourth Amendment rights to be secure against unreasonable searches and seizures. They also brought a claim under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), claiming that Johnson County and Sheriff Denning had engaged in

---

[7] The Hartes' claims against Trooper Wingo related to his role in the events that led to the Sheriff's Office's search of the Hartes' house. Because he played no role in the execution of the warrant, the Hartes excluded him from their excessive-force claim. Trooper Wingo filed a separate summary-judgment motion, which the district court ultimately granted. Though the district court analyzed the claims against Trooper Wingo together with the claims against the other officials, it observed that "[i]n the absence of an underlying constitutional violation, [the Hartes'] claims against any individual (such as defendants Denning and Wingo) who is alleged to have supervised, directed or set in motion the constitutional violation necessarily fail." *Harte v. Bd. of Comm'rs of the Cty. of Johnson Cty.*, 151 F. Supp. 3d 1168, 1186 n.9 (D. Kan. 2015). Because the Hartes didn't specifically appeal this decision, and because Trooper Wingo wasn't involved in the search of the Hartes' house and didn't supervise any of the deputies who conducted the search, I would leave in place the district court's grant of Trooper Wingo's summary-judgment motion.

unconstitutional practices and failed to properly train and supervise their employees. Finally, the Hartes brought state-law claims against the deputies for trespass, assault, false arrest and imprisonment, abuse of process, intentional infliction of emotional distress, and false light invasion of privacy. Trooper Wingo moved to dismiss the claims against him, but the district court denied his motion. Later, Trooper Wingo and the other officials filed separate summary-judgment motions on qualified-immunity grounds.

In December 2015, the district court granted both summary-judgment motions, concluding (1) that the search-warrant affidavit gave probable cause to search the Hartes' house, making the search reasonable under the Fourth Amendment; (2) that even if the probable cause had dissipated sometime during the search, the Fourth Amendment issue wasn't beyond debate, so the defendants hadn't violated clearly established law; (3) that the defendants didn't use excessive force when searching the Hartes' house; and (4) that because there was no underlying constitutional violation by any individual deputy, the Hartes' *Monell* and state-law claims failed because the warrant entitled them to enter the Hartes' house, to search it, and to detain the family during the search.

## DISCUSSION

### I.  Standard of Review

We review de novo a grant of summary judgment based on qualified immunity. *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015). "[Q]ualified immunity . . . is both a defense to liability and a limited 'entitlement not to stand trial

11

or face the other burdens of litigation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). We review summary-judgment motions on qualified-immunity grounds differently from other summary-judgment motions. *See Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011). When a defendant asserts a qualified-immunity defense, the burden shifts to the plaintiff to submit sufficient evidence to show (1) the violation of a constitutional right, (2) that was clearly established at the time of the violation. *See id.* We may decide which of these prongs to address first, and need not address both. *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 n.2 (10th Cir. 2009).

A constitutional right is clearly established when "'[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Though the plaintiff need not cite a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004). Still, we must not "define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742.

To meet the "heavy, two-part burden" necessary to overcome a qualified-immunity defense, plaintiffs must allege facts sufficient to show a constitutional violation, and those facts must find support from admissible evidence in the record.

12

*Puller*, 781 F.3d at 1196 (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)); *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015). "[W]e construe the facts in the light most favorable to the plaintiff as the non-movant." *Quinn*, 780 F.3d at 1004. But we need not make unreasonable inferences or adopt one party's version of the facts if the record doesn't support it. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, . . . a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1187 (10th Cir. 2013) ("[O]ur summary judgment standard . . . does not require us to make unreasonable inferences in favor of the non-moving party.") (quoting *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008)).

Here, the Hartes allege that the Defendants violated their Fourth Amendment rights to be secure against unreasonable searches and seizures in three ways: (1) by submitting a perjured affidavit to procure a search warrant that wasn't supported by probable cause; (2) by unreasonably prolonging the search and detention beyond the terms of the warrant; and (3) by using excessive force in executing the search warrant. I address these three claims first and then turn to the *Monell* claim. Finally, I consider the Hartes' state-law claims.

## II.    Fourth Amendment § 1983 Claims

### A.    Invalid Search Warrant

13

The Hartes challenge the search warrant on several grounds. Specifically, they allege that probable cause didn't support the search warrant, because Deputy Burns's search-warrant affidavit contained material misstatements and omissions. On this point, they dispute the district court's conclusion that Deputies Burns and Blake had in fact obtained two positive field-test results on the tea leaves taken from the outside trash. The Hartes contend that the deputies (1) lied about whether they field-tested the vegetation from the Hartes' trash at all, (2) lied about the results, or (3) misinterpreted the results or incorrectly used the field test. And, they say, "the summary-judgment record is . . . *most consistent* with lying." Appellant's Opening Br. at 29. But I disagree with these bases.

### 1.    Constitutional Violation

A search warrant generally establishes probable cause unless it "was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012)), or unless the affiant has misrepresented or omitted material facts to the judge issuing the warrant, *id.* "This test is . . . objective . . . : when there is no dispute over the material facts, a court may determine as a matter of law whether a reasonable officer would have found probable cause under the circumstances." *Id.* To overcome the validity of the search warrant, the Hartes must present evidence either that the deputies knew that the information in the search-warrant affidavit was false or "that the [deputies] 'in fact entertained serious doubts as to the truth of [their] allegations,'" but still

14

sought a search warrant in reckless disregard for the truth. *Beard v. City of Northglenn*, 24 F.3d 110, 114, 116 (10th Cir. 1994) (quoting *United States v. Williams*, 737 F.2d 594, 602 (7th Cir. 1984)). "[A] factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations." *Id.* (quoting *Williams*, 737 F.2d at 602).

The Hartes also challenged the search warrant under *Franks v. Delaware*, 438 U.S. 154 (1978). Under *Franks*, we presume that the affidavit supporting a search warrant is valid. *Franks*, 438 U.S. at 171–72. Only intentional and knowingly false statements in a search-warrant affidavit, or statements made with reckless disregard for the truth, can undermine a finding of probable cause. *Id.* at 171. "[N]egligence or innocent mistake[s] are insufficient" to challenge a warrant affidavit's validity. *Id.*

### a.     The Wet Vegetation

In my view, the record doesn't support the Hartes' claim that Deputy Burns lied in his affidavit. The Hartes rely heavily on the lack of photographic or documentary evidence of the field-test results. They find it suspicious that Deputy Burns took no photos of the field-test results despite it being his general practice to do so, and that Deputy Blake took photos of the trash but not the tea leaves or the field-test results. They also point out that even though Deputy Burns was a trained K-9 officer, he made no effort to have his dog sniff the tea leaves. Finally, the Hartes observe that both the lab technician and their own expert said that the tea leaves looked nothing like marijuana, meaning that the deputies must have known that the leaves weren't marijuana even before they field tested them.

15

I can't reasonably infer from these facts that the officers lied about field-testing the suspected marijuana or about the test results. Accepting the Hartes' version of the facts as true doesn't require ignoring additional evidence presented by the deputies, because the deputies' evidence supplements rather than conflicts with the Hartes' evidence. The two parties simply ask us to reach different inferences based on the same set of facts. But, in my view, to infer from the Hartes' evidence that the deputies lied would require an unreasonable inference based on little more than speculation. *See Llewellyn*, 711 F.3d at 1187.

Deputy Burns testified that he generally photographs field-test results when he's "on the side of a road and do[ing] a field test kit in order to make an arrest," or when he is using a field-test kit "as part of my probable cause for an arrest." Appellant's App. at A546. But almost immediately after this, he said that he didn't photograph the field-test results from the Hartes' tea leaves because "[i]t wasn't part of our normal practice to take pictures of [field tests] during the trash pulls." *Id.* Deputy Blake testified that he typically takes pictures of trash pulls when it would be impractical to keep the relevant trash as evidence, for example, if it might "spoil or mold." *Id.* at A563. And Deputy Blake correctly believed that the Sheriff's Office could preserve the green vegetation from the trash—in fact, the crime lab successfully tested the tea leaves four months later.

According to Deputy Blake, he took pictures of paperwork in the Hartes' trash to link the trash to the Harte family and address, but didn't take any pictures of the field test because, just as Deputy Burns said, "[i]t wasn't a common practice at that

16

time." *Id.* at A564. This testimony doesn't support an inference that the agents lied about the tests or misrepresented them. Though I agree with the Hartes that the deputies could have photographed the field-test results, the evidence doesn't require the inference that the deputies lied. *See Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) ("[E]vidence, including testimony, must be based on more than mere speculation, conjecture, or surmise. Unsubstantiated allegations carry no probative weight in summary judgment proceedings." (quoting *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006))).

Nor do I think it matters much that Deputy Burns didn't have his drug dog sniff the supposed marijuana from the trash. He explained that the overwhelming smell of the trash would have impeded the dog in detecting any marijuana-related odor. And he also expressed concern that the wet vegetation might have "some kind of chemical that wouldn't be safe" to sniff. Appellant's App. at A549. Deputy Burns testified that though he ordinarily uses his dog to help build probable cause for a search warrant, he didn't need a search warrant for the Hartes' outside trash. So in my view, Deputy Burns's failure to use his drug dog to sniff the Hartes' trash doesn't support the Hartes' allegation that the deputies lied about the positive field-test results.

According to the Hartes, the deputies also recklessly failed to heed other warning signs. They say that multiple people confirmed that the wet vegetation didn't look or smell like marijuana, and that the vegetation contained bits of flowers and

17

fruit.[8] But the deputies found the clumped tea leaves in the trash containing other discarded food, and they smelled only trash when they found the leaves. So the absence of the smell of marijuana, when combined with the surrounding circumstances of the trash pull, doesn't require an inference that the deputies knew or should have known that the wet vegetation was not processed marijuana.

In addition, the deputies had other reasons to believe that the vegetation was marijuana. Deputy Burns testified that when he unrolled some leaves, he saw serrated-leaf edges, and saw stems consistent with marijuana stems. Deputy Burns further said that in his experience, the saturated vegetation looked like marijuana that had been processed to extract the THC. Processed marijuana looks similar to brewed tea leaves, so even a trained eye could mistake one for the other when the material is mixed in with other trash. *See* Appellee Sheriff's Office's Response Br. at 5–6 (comparing photographs of processed marijuana with photographs of brewed tea leaves). Finally, Deputy Burns testified that he had never before seen loose-leaf tea. I conclude that it would be unreasonable after viewing all the evidence to infer that the deputies knew or suspected that the wet vegetation was not marijuana. *See Llewellyn*, 711 F.3d at 1187.

In fact, the record lends support to Deputy Burns's claims set forth in the search-warrant affidavit. As the district court observed, a Johnson County crime-lab

---

[8] The Hartes' expert tested four types of Teavana-brand tea, each of which Mrs. Harte said she had purchased in the spring of 2012. The expert confirmed that each of these teas contained flower buds and petals, as well as pieces of fruit, and concluded that they looked like potpourri rather than marijuana.

18

technician tested the tea leaves four months after the deputies did and received false positives on both samples. The Hartes acknowledge that the Lynn Peavey KN-reagent test often yields false positives, supporting the deputies' claims that they did obtain false positives. Appellant's Opening Br. at 39 ("Readily available sources would have suggested to the deputies that their 'test' yielded a false-positive rate *around* 70%, especially with kitchen botanicals." (emphasis in original)). And the Hartes' own expert obtained a false positive when field-testing samples of the same kind and brand of brewed tea leaves that Mrs. Harte thought she had brewed and later tossed in the trash.[9]

### b. Statements About the Field Tests

Similarly, Deputy Burns didn't omit material information or include material misstatements in his search-warrant affidavit. "The standards of deliberate falsehood and reckless disregard set forth in *Franks* apply to *material* omissions, as well as affirmative falsehoods." *United States v. Avery*, 295 F.3d 1158, 1166 (10th Cir. 2002)

---

[9] As Judge Moritz points out, the Hartes' expert also tested the actual green vegetation that the deputies had found in the Hartes' trash, and the material tested negative for marijuana. *See* Moritz. Op. 5. In light of the field test's rate of false positives and the Hartes' claims that the field test is often inaccurate, I am unconvinced that the expert's accurate test result from three years after the initial test is enough to support the Hartes' claim that the deputies lied about obtaining positive test results.

In my view, the field test is always generally inaccurate. Even the Hartes state that the KN-reagent field test yields false positives about 70% of the time. Therefore, the most reasonable inference is that the deputies and the crime lab technician obtained false-positive test results for their KN-reagent tests—they were the 70%— and the Hartes' expert obtained accurate negative test results for his KN-reagent tests—he was the 30%.

(emphasis added) (quoting *United States v. McKissick*, 204 F.3d 1282, 1297 (10th Cir. 2000)). And omissions, like misstatements, are material if the omitted information is so probative that it negates probable cause. *Stewart v. Donges*, 915 F.2d 572, 582 n.13 (10th Cir. 1990).

The Hartes claim that the deputies recklessly misstated that the KN-reagent field test is similar to the test used by the Johnson County crime lab, and that the deputies recklessly disregarded a warning instruction that the field test wouldn't provide probable cause. They also claim that Deputy Burns recklessly omitted from his search-warrant affidavit that he had found the vegetation in the kitchen trash, that the vegetation was hard to identify and didn't smell like marijuana, and that no one had sent the vegetation to the crime lab. These arguments similarly fail to create a genuine dispute of material fact that the deputies lied or recklessly disregarded the truth.

In his affidavit, Deputy Burns stated that "[t]he field test utilized by Deputy Blake consists of reagents similar to those utilized by the Johnson County Criminalistics Laboratory to conduct its initial screening test for marijuana. This test is presumptive but not conclusive for the presence of marijuana." Appellant's App. at A709. Even if this is "boilerplate" language that Deputy Burns included "in all his drug affidavits at the urging of [an] Assistant District Attorney," it still communicates that the field-test results weren't conclusive. Appellant's Opening Br. at 14; Appellant's App. at A551–52. And Johnson County's crime-lab technician confirmed that the lab used KN-reagent-based tests to test for the presence of

20

marijuana. Further, by Kansas law, KN-reagent field tests are acceptable at preliminary hearings to "establish probable cause to believe that the tested substance is the controlled substance alleged." Kan. Stat. Ann. § 22-2902c; *see also* Kan. Admin. Regs. § 10-22-1(b)(6) (listing the Fast Blue or BB reagents, which are different names for the KN-reagent, as acceptable field tests).

I also find it significant that Deputy Burns testified that he wasn't aware of the possible occurrence of false positives. So, though Deputy Burns didn't explicitly say that the field test is often inaccurate—because he didn't think the test was inaccurate at all—he sufficiently advised the state judge that the field test wasn't conclusive. Probable cause for a search warrant depends on the facts known to law-enforcement officers when they obtain the search warrant. *See Buck v. City of Albuquerque*, 549 F.3d 1269, 1281 (10th Cir. 2008); *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 971 (7th Cir. 2003) (false positive field-test results didn't undermine probable cause where unreliability of field tests was determined only after the warrant issued and no evidence suggested the officer had thought the field tests were unreliable when he applied for the warrant).

Nor is it problematic that Deputy Burns's affidavit didn't mention that the deputies had found the vegetation in a bag containing the kitchen trash, that it hadn't smelled like marijuana, or that it was hard to identify. In light of the two false-positive test results, I don't believe that this information would have altered the state judge's decision to issue the search warrant. The same is true of Deputy Burns's failure to mention that no one had sent the wet vegetation to the crime lab for testing.

21

Although he and Deputy Blake would have done better to take this step, they did at least keep the vegetation as evidence, presumably because they believed it was marijuana.

### c. Failure to Investigate Further & Unreasonable Reliance on the Field Tests

The Hartes also fault the deputies for limiting their investigation to the three trash pulls. The Hartes argue that a better investigation would have revealed information suggesting that the field test results were wrong. Indeed, the deputies seem to have done the bare minimum required to obtain a search warrant. The deputies didn't surveil the Hartes' house, they didn't investigate the Hartes' backgrounds (and learn that both Hartes were former CIA employees) or run their criminal histories, they didn't send the suspicious vegetation to the crime lab, and they didn't inspect utility records for the house to see if the Hartes' electric bills showed energy consumption consistent with the suspected grow operation.

This surely isn't top-notch policing that any law enforcement agency might take pride in. But for purposes of qualified immunity, the deputies needed merely to show arguable probable cause to satisfy the Fourth Amendment's reasonableness requirement. *See Stonecipher*, 759 F.3d at 1141 ("Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists."). I certainly don't commend the officers for their investigation, but the failure "to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming

22

corroborative evidence rarely suggests a knowing or reckless disregard for the truth." *Id.* at 1142 (quoting *Beard*, 24 F.3d at 116).

The Hartes claim that the deputies should have followed the directions on the test and submitted the tea leaves to the crime lab for further analysis. They argue that field tests—the Lynn Peavey KN-reagent field test in particular—are widely known to be inaccurate. *See* Amicus Curiae Marijuana Policy Project Br. at 10 (explaining that field tests in general are difficult to read, often tainted by user error, and prone to giving false-positive results for an array of legal substances, including vanilla extract and household herbs and spices).

I certainly have concerns about this potential inaccuracy. Still, Kansas law permitted the deputies to rely on the KN-reagent field tests to establish probable cause that the vegetation was marijuana. Kan. Stat. Ann. § 22-2902c; Kan. Admin. Regs. § 10-22-1. The law provides that "[a] positive result on a field test described in and conducted pursuant to this subsection shall be deemed sufficient to establish probable cause to believe that the tested substance is the controlled substance alleged." Kan. Stat. Ann. § 22-2902c(a)(2). And Kansas regulations specify that the Kansas Bureau of Investigation permits law-enforcement officers to use field tests containing "Fast Blue B or BB reagent or the salts of either reagent"—Fast Blue B salts being another name for the KN reagent. Kan. Admin. Regs. § 10-22-1. Thus, the deputies reasonably relied on the Lynn Peavey KN-reagent field test in applying for a warrant.

23

Even if the deputies had mistakenly interpreted the tests as positive, this wouldn't have invalidated the search warrant. Negligence is insufficient to challenge a search warrant's validity. *Franks*, 438 U.S. at 171. Because the Hartes haven't presented evidence sufficient for a jury to find that Deputy Burns knowingly, intentionally, or recklessly gave false statements in his warrant affidavit, I presume, as I must, that the affidavit was valid. *See id.* at 156. In other words, as long as the deputies weren't reckless in believing that the green vegetation in the Hartes' trash had tested positive for marijuana, the affidavit was valid, and therefore the search warrant was supported by probable cause.

In addition, the Hartes argue that Deputies Burns and Blake weren't properly trained to use the field tests. In fact, Deputy Burns confirmed that he had received no formal training on "the actual processing of marijuana." Appellant's App. at A550. But Deputy Burns had received training from the manufacturer of a field test similar to the Lynn Peavey KN-reagent test. And both Deputies Burns and Blake were trained in marijuana grows and drug recognition and detection. The Hartes presented evidence that Deputy Blake had to do remedial training for field testing in December 2013, after the Sheriff's Office changed its policies. But Deputy Blake needed this training because he had found several tests for methamphetamine and cocaine negative when they should have been positive.

Similarly, even if the deputies *should* have known that the test was inaccurate, this would negate probable cause only if they recklessly disregarded information suggesting as much. The Hartes point out that the field-test instructions say that

positive test results give probable cause only to submit a sample to a crime laboratory, meaning that the deputies should have known better than to rely on it. But the instructions on the box bind no one. Moreover, the instructions use the term "probable cause" in a non-legalistic way, simply to caution testers that crime-lab results are more reliable.

The deputies knew that Trooper Wingo had seen Mr. Harte shopping at a hydroponic-growing store and that their trash pulls had yielded two positive field tests of wet, green vegetation that, to them, looked like marijuana processed to extract THC. Even though I believe that the deputies should have investigated further before applying for a search warrant, the evidence they obtained gave them at least arguable probable cause to believe that the Hartes were growing marijuana. Thus, because the evidence does not support the Hartes' claim that the deputies lied or recklessly misrepresented information in the search-warrant affidavit, I would hold that the search warrant itself complied with the Fourth Amendment.

### 2. Clearly Established Law

Even if I concluded that the deputies' search-warrant affidavit didn't provide probable cause and violated the Fourth Amendment, I still couldn't conclude that the deputies violated clearly established law. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *al-Kidd*,

25

563 U.S. at 741). The Supreme Court has repeatedly reminded us "not to define clearly established law at a high level of generality." *Id.* (quoting *al-Kidd*, 563 U.S. at 742). We must take care to particularly define the allegedly unlawful actions and we must conduct our qualified-immunity inquiry "in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

The Fourth Amendment in particular demands such specificity because law-enforcement officers can have difficulty determining "how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). Thus, in *Mullenix*, the Court found too general under the Fourth Amendment the principle that "deadly force is only permissible where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* at 309 (quoting *Haugen v. Brosseau*, 339 F.3d 857, 873 (9th Cir. 2003)). Rather, the inquiry should have been whether the Fourth Amendment prohibited "shoot[ing] a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Id.* (quoting *Brosseau*, 543 U.S. at 199–200).

Under the second prong of the qualified-immunity analysis, the Hartes must either "identify a case where an officer acting under similar circumstances as [the deputies] was held to have violated the Fourth Amendment," *White v. Pauly*, 137 S. Ct. 548, 552 (2017), or, absent an on-point precedent, show that the deputies' conduct was so egregious that any officer would know it was unconstitutional, *al-*

26

*Kidd*, 563 U.S. at 741. So the inquiry isn't simply whether the deputies' probable cause would have vanished had they investigated further. Rather, we must ask whether the deputies lacked arguable probable cause based on the facts they alleged in the search-warrant affidavit—that the suspect had entered a hydroponic-gardening store and left with a bag, that their trash pulls twice gave positive test results for marijuana, and that they used a legislatively approved field test. The Hartes bear the burden of establishing that their asserted Fourth Amendment violation was clearly established on the day of the search. On the evidence presented, I can't conclude that every reasonable officer would have known that the search-warrant affidavit did not give probable cause.

Here, the Hartes cite no cases concluding that law-enforcement officers lack probable cause when relying on two positive field-test results for marijuana. The Hartes challenge the reliability of the Lynn Peavey KN-reagent field test, and other field tests in general. But no court has gone so far as to prohibit law-enforcement officers from relying on field tests to establish probable cause. In fact, courts regularly uphold this practice. *See, e.g.*, *Cooper*, 325 F.3d at 971 (holding that police officers had no duty to send field-tested items taken from the suspect's trash to the lab before applying for a warrant, because the officers didn't discover the test's unreliability until after the warrant issued).

The cases the Hartes do cite provide them little help. First, *Franks* describes Fourth Amendment rights too generally to support the Hartes' challenge to the search warrant's validity. *See Pauly*, 137 S. Ct. at 552 (reiterating the longstanding principle

27

that clearly established law must not be defined too generally). *Franks* stands for the proposition that parties may challenge search warrants with evidence sufficient to show that the search-warrant affiant provided false information—either intentionally or with reckless disregard for the truth. A person challenging a search warrant must

> make[] a *substantial* preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks*, 438 U.S. at 155–56 (emphasis added). And even then, the search warrant is legally deficient only if, after setting aside the false information, the remainder of the affidavit fails to establish probable cause. *Id.* at 156. Under *Franks*, the Hartes needed to present enough evidence to support their claim that the deputies had lied about testing the wet vegetation from the trash, or recklessly disregarded the truth by relying on false-positive test results that the loose-leaf tea was marijuana. And their cases would have to clearly establish that the Fourth Amendment prohibited the deputies from relying on KN-reagent or other similar field tests.

Stonecipher does no more than *Franks* to support the Hartes' claim—it is so factually distinguishable from this case that it would offer the deputies little guidance. And, further, we found no Fourth Amendment violation there. In *Stonecipher*, a federal agent investigating the Stoneciphers for illegally dealing guns and explosives from their house learned from two separate background checks that the husband had pleaded guilty to domestic assault in Missouri. 759 F.3d at 1139. An Assistant United States Attorney reviewed the husband's file and advised the agent

28

that the husband's domestic-assault conviction made it a crime for the husband to possess and sell firearms. *Id.* (citing 18 U.S.C. § 922(g)(9)). The agent then filed a search-warrant affidavit based on this information, though he failed to note in the warrant that the husband had received a suspended imposition of sentence for the assault, and that his ineligibility to possess firearms was later overturned. *Id.* at 1139–40. The husband claimed that the search violated the Fourth Amendment because the warrant wasn't supported by probable cause. *Id.*

We held that the agents were entitled to qualified immunity despite their omissions in the search-warrant affidavit because federal agents couldn't be expected to know the minutiae of state laws and federal regulations. *Id.* at 1143–44. Quite simply, *Stonecipher* would not advise the deputies that their actions would violate clearly established law.

The Hartes also rely on *Eaton v. Lexington-Fayette Urban County Government*, 811 F.3d 819 (6th Cir. 2016), to support their claim that the deputies lacked probable cause based on the field tests. In *Eaton*, a man alleged that Kentucky's drug-testing program violated his Fourth and Fourteenth Amendment rights because it was unreliable. *Id.* at 821. The Sixth Circuit acknowledged that "an utterly unreliable—read random—testing procedure might well violate the Fourth Amendment." *Id.* at 822. And it said that "[p]rocedures that generate results that are not close to 'accurate in the overwhelming majority of the cases[]' . . . may themselves cause testing to be unreasonable in the Fourth Amendment sense." *Id.* (quoting *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 632 n.10 (1989)). But the

29

court ultimately concluded that the testing at issue wasn't unreasonable, noting that the plaintiff hadn't brought any probative evidence to support his claim. *Id.* at 820, 823–24.

The sole similarity between *Eaton* and this case is that they both involved drug testing. Moreover, at the time the deputies used the Lynn Peavey KN-reagent field test, they didn't suspect that it was "utterly unreliable." *Id.* at 822. And *Eaton* held that some error in drug testing procedures isn't enough to make them unreasonable under the Fourth Amendment. *Id.* Therefore, *Eaton* doesn't advance the Hartes' claim on this issue.

Finally, the Hartes point to *Harmon v. Pollock*, 446 F.3d 1069 (10th Cir. 2006), to support their claim that the Sheriff's Office unreasonably failed to investigate more thoroughly. But while I acknowledge that the law-enforcement officers in *Harmon* more thoroughly investigated before applying for a search warrant, *Harmon* didn't rule that a less-robust investigation, as here, would have defeated probable cause. *Id.* In fact, we have explicitly stated that law-enforcement officers need not investigate every possible lead before applying for a warrant. *Stonecipher*, 759 F.3d at 1142.

In sum, even if I concluded that the deputies here acted unreasonably in procuring a warrant to search the Hartes' house for marijuana, I couldn't do so based on clearly established law.

B.      **Unreasonable Search**

1.      **Constitutional Violation**

30

The Hartes also claim that the deputies violated the Fourth Amendment by unreasonably prolonging the search and detention beyond the terms of the warrant. Specifically, they claim that the deputies improperly continued searching for any evidence of marijuana after they determined that the Hartes were growing tomatoes instead of marijuana. They note that the warrant prohibited the deputies from searching for anything except marijuana and marijuana-related drug paraphernalia, and go on to say that "[w]ithin twenty minutes of the raid, the deputies knew that they would not find the grow operation they were hoping for." Appellant's Opening Br. at 43. So, the Hartes argue, the deputies should have stopped "hunting for evidence of a *remnant* of a grow operation," and certainly had no right to look through "'drawers, closets, [and] bags' for evidence of even a single joint." *Id.* (alteration in original) (quoting Appellant's App. at A639–40). From this, the Hartes argue that the deputies unreasonably detained them because law-enforcement officers may not detain residents during an improper search. I agree. Upon learning that the Hartes had no marijuana-grow operation, probable cause dissipated and the deputies could not continue to rummage for any evidence of marijuana or drug paraphernalia and detain the Hartes while doing so.

The Fourth Amendment prohibits unreasonable searches. U.S. Const. amend. IV. For a search to be reasonable, probable cause must exist at all times during the search. *See United States v. Grubbs*, 547 U.S. 90, 95 n.2 (2006) (discussing how new information or the passage of time can cause "probable cause . . . [to] cease to exist after a warrant is issued"). Thus, even when law-enforcement officers obtain a proper

31

search warrant, probable cause may dissipate before the warrant's execution, rendering the search unreasonable under the Fourth Amendment. *See Baranski v. Fifteen Unknown Agents of the Bureau of Alcohol, Tobacco & Firearms*, 452 F.3d 433, 452 (6th Cir. 2006) ("[T]he warrant need not only be valid when issued, but also when the search is conducted." (citing 2 Wayne R. LaFave, Search and Seizure § 4.7(a) (4th ed. 2004))). This principle applies throughout the search—law-enforcement officers must not "disregard facts tending to dissipate probable cause." *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005) (quoting *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988)). "[T]here may be circumstances in which continuation of a search will be permissible only if the probable cause continues." 2 Wayne R. LaFave, § 3.2(d) n.112 (5th ed. 2012) (emphasis omitted) (citing *Berg v. State*, 384 So. 2d 292, 294 (Fla. Dist. Ct. App. 1980) ("Because the negative field tests vitiated the existence of probable cause and the appellant withdrew his consent, the detectives' continued search was violative of the appellant's fourth amendment rights . . . .")). Importantly, officers can detain the occupants of a house during a search, but only if the search remains proper under the Fourth Amendment. *Michigan v. Summers*, 452 U.S. 692, 705 (1981).

In determining whether probable cause dissipated, I examine what the deputies knew and when. Before the search, the deputies knew that Mr. Harte had shopped one time at a Green Circle store and left carrying a small shopping bag. Based on this information, the deputies conducted three trash pulls from which they found green vegetation. They field-tested the vegetation twice and received positive results for

32

marijuana. To the deputies, the three trash pulls combined with the two positive field-test results indicated that the Hartes were steadily harvesting marijuana from a marijuana-grow operation. I concluded in Section II.A that the deputies had probable cause to obtain a search warrant, but the analysis does not end there.

The deputies learned more about the Hartes once they executed the warrant. "The deputies quickly found the hydroponic garden in the basement," which contained at least six plants, including tomato plants and other vegetables, in various stages of growth. Appellee Sheriff's Office's Response Br. at 14 (citing Appellant's App. at A571). When the deputies field-tested these plants, the plants tested negative for marijuana. The deputies saw no indicia of a marijuana-grow operation, such as blacked-out windows, fans, ventilators, drying racks, or scales.

The deputies claim the garden had "quite a few empty spaces on the hydroponic spots, holes that did not have pots in them."[10] Appellant's App. at A637. One deputy also claimed the plants were dead. This led the deputies to continue searching the basement for any remnants of an earlier marijuana-grow operation— e.g., stray leaves or stems, or harvested marijuana being processed. Deputy Larry Shoop helped in this search and was "positive we were going to find remnants of a grow operation that . . . had been there at one point" because "[t]ypically even when

---

[10] Contrary to the deputies' account, I note that their photographs of the grow operation show just two empty slots and at least sixteen occupied slots. The occupied slots all contained cups or pots similar to those containing the tomatoes and other vegetables, which were still very much alive, and were also labeled.

people clean up grow operations, we will find leaves that they have failed to sweep up, or stems that they had failed to get rid of." *Id.* Yet the deputies found no leaves, stems, or other remnants of a grow operation.

While I accept that marijuana remnants would be probative of a past grow operation, the opposite could be said for the absence of remnants, which indicates that a marijuana-grow operation had never existed. Deputy Shoop admitted that after finding the hydroponic setup in the basement, the deputies knew within the first 15 or 20 minutes that "we wouldn't have a massive grow operation, as we had speculated."[11] *Id.* at A636.

I conclude that what the deputies learned early on in the search dissipated any probable cause to continue searching. Discovering tomato plants and other vegetables in the basement dispelled any notion that the Hartes were steadily harvesting and growing marijuana. The absence of sealed or blacked-out windows, fans, ventilators, drying racks, and scales further supports this. The deputies didn't claim that they saw or smelled anything suspicious when they secured the home for threats before they

---

[11] The deputies now maintain that it took them an hour or hour and a half to determine that the Hartes had "no active . . . [or] dismantled grow operation." Appellant's App. at A639. But they don't explain why they needed so much time to reach this conclusion. Upon entering the unfinished basement, they immediately saw and field-tested the tomato-grow operation. They found no remnants on the cement floor. One deputy said that he had never seen a house with both a hydroponic vegetable garden and a hidden room with a hydroponic marijuana grow, and the deputies had already gone through the home to secure it and had seen no indicia of marijuana growing or use. And especially making all reasonable inferences from the evidence in the Hartes' favor, I conclude that the deputies reasonably knew that the Hartes had no marijuana-grow operation early in the search.

34

began their housewide search in earnest. Nor did the deputies find marijuana stems, leaves, or other residue.

What their eyes, ears, and noses told them once inside the Hartes' house severely undermined the positive field-test results from the trash pulls. The absence of remnants, stems, or leaves "left over from the processing of the plants after cultivation," Appellant's App. at A709, should have alerted the deputies that the green vegetation from the Hartes' trash was not processed marijuana from a grow operation. Moreover, they knew that their field test was not as certain as a lab test. Still, with their field tests from the trash pull now far more suspect, the deputies searched the entire house—even inside dresser drawers and under beds—as though the reliability of the field tests was unaffected. And though they had full access to the kitchen trash during the search, and despite relying almost exclusively on trash pulls to obtain the warrant, the record is silent on whether the deputies even checked the Hartes' trash during the search.

Then, knowing much more than the state judge knew when issuing the warrant, armed with strong reasons to doubt their previous conclusions about the Hartes, and lacking any evidence independent of a marijuana-grow operation that the Hartes were marijuana users, the deputies began searching for evidence of personal marijuana use. They didn't return to the state judge who issued the warrant. The deputies contend that they "switched just a little bit, and being that the warrant cover[ed] all marijuana in all forms . . . we were going to find some kind of use of marijuana in the house . . . more specific to a personal type of use." *Id.* at A639. Pressing on with the housewide

35

search, a couple of deputies claimed to have smelled a faint odor of marijuana in "various places" in the house (other deputies had not smelled it), so the deputies called for a drug dog. *Id.* at A178. Despite being deployed throughout the house, the dog failed to alert to the presence of any drugs, and the dog's handler didn't smell any marijuana either. All told, the search lasted about two-and-a-half hours.

I conclude that the tenuous probable cause that the Hartes might have used marijuana depended on their growing marijuana. Thus, when the probable cause for growing marijuana dissipated, the already-weak probable cause of personal use also dissipated. By ignoring everything they learned and rummaging for any marijuana, the deputies ran afoul of the Fourth Amendment.

In dispute, the deputies point to the search warrant's language authorizing seizure of "[m]arijuana in all forms," including "plants and plant material, marijuana seeds, [and] marijuana in any stages of growth and/or processing." Appellant's App. at A705. And they point to other language allowing seizure of "[d]rug [p]araphernalia used to cultivate and/or process marijuana," including "packaging material, trimmers, scales, dryers, and hanging systems," as well as "drug paraphernalia used to introduce drugs into the body." *Id.* The deputies also state that "no record evidence suggest[s] that any deputy actually looked in a place where evidence of marijuana or paraphernalia could not be found." Appellee Sheriff's Office's Response Br. at 46. I acknowledge that finding a marijuana-grow operation would have enabled a search for and seizure of these items.

36

But the deputies cannot ignore the facts they learned when they executed the warrant, namely that their suspected marijuana-grow operation did not exist. To rely on the above search-warrant language, the deputies needed to find a marijuana-grow operation or remnants of one. The affidavit shows this. Paragraphs twelve and thirteen of the affidavit lie at its heart.[12] Those paragraphs read as follows:

> 12. The Affiant has been involved in the investigation of no less than 15 marijuana indoor grow operations and has received training specific to marijuana cultivation. Through this training and experience, the Affiant has come to know marijuana plant material which is left over from the processing of the plants after cultivation, such as leaves and stems, is often saved to be used for extraction of THC for the manufacture of resins and oils with extremely high THC content.

> 13. Based on the Affiant's law enforcement training and experience, the Affiant knows marijuana is often grown for sale and narcotics dealers who sell out of their residence commonly maintain illicitly gained quantities of US currency. The Affiant also knows that narcotics dealers commonly maintain dealing records so they may keep track of profits and names of individuals who owe them money.

Appellant's App. at A709. Nothing in the affidavit gave (or even tried to give) probable cause that the Hartes used marijuana unrelated to a grow operation. When the deputies discovered a tomato garden, their entire basis for believing that the Hartes used marijuana disappeared—they had no more basis to search the Hartes' house for marijuana than they had to search any random neighbor's house.

---

[12] The first eleven paragraphs of the affidavit explain how the deputies investigated the Hartes, and the last paragraph lists Deputy Burns's drug-investigation experience.

The deputies were not free to ignore facts that dissipated probable cause. *See Ortiz-Hernandez*, 427 F.3d at 574 (probable cause to arrest a suspect for drug trafficking dissipated after agents strip-searched the suspect and found nothing). Instructive on this point is *United States v. Bowling*, 900 F.2d 926 (6th Cir. 1990). In *Bowling*, Forest Service agents discovered two marijuana plots on federal land, allegedly maintained by the Bowlings. *Id.* at 928. While some agents were obtaining a search warrant to search the Bowlings' trailer, Mr. Bowling gave two remaining agents consent to search the trailer without a warrant. *Id.* at 928–29. These agents searched the trailer and found nothing, though the parties disputed how thoroughly the agents searched. *Id.* at 929. Two hours after the consent search, the absent agents returned to the trailer with a search warrant. *Id.* The magistrate judge didn't know about the consent search when he issued the warrant, but the agents executing the search warrant learned soon after entering the trailer that two other agents had already done "a preliminary search of the trailer." *Id.* The second search produced marijuana and marijuana residue, plant food, ammunition, and two issues of a marijuana-themed magazine. *Id.* At trial, the Bowlings moved to suppress the evidence that agents had seized from their trailer during the second search. *Id.* They argued that the second search was illegal because the consent search had "eliminated" probable cause to issue the warrant for the second search. *Id.* The Sixth Circuit agreed with the Bowlings. *Id.*

First, the court held that the agents had no "license to proceed with a search whose continuing probable cause was at the very least questionable." *Id.* at 933. The

38

court emphasized that absent "urgent circumstances," officers should refrain from relying on their own probable-cause determination, and should instead go to a neutral magistrate when they learn of new circumstances that affect the probable cause supporting their warrant. *Id.* (citing *Johnson v. United States*, 333 U.S. 10, 14 (1948)). "The Fourth Amendment's protection against unreasonable searches and seizures would be an incomplete and highly manipulable safeguard if a neutral magistrate could not play the same impartial role in assessing continuing probable cause that he plays in determining probable cause to issue the warrant in the first place." *Id.* But, concluding that the first search wasn't so broad or thorough that it dissipated probable cause, the Sixth Circuit affirmed the district court's denial of suppression. *Id.* at 934.

Another helpful case is *United States v. Keszthelyi*, 308 F.3d 557 (6th Cir. 2002). There, officers obtained a search and arrest warrant for a defendant based on an undercover investigation that culminated in a series of cocaine sales. *Id.* at 562. Soon after arresting the defendant, officers searched the defendant's home and discovered various incriminating items, including a digital scale, surveillance equipment, two firearms, ammunition, pills, syringes, and $1,000 cash, but no cocaine. *Id.* at 563. The search lasted about two hours. *Id.* Feeling that they had missed something, the officers went back to the defendant's house the next day and searched it again without obtaining a new search warrant. *Id.* The second search yielded one ounce of cocaine hidden behind the defendant's oven. *Id.*

39

The defendant moved to suppress the evidence seized during the searches, arguing in part that the second search wasn't a reasonable continuation of the original search. *Id.* at 567. The Sixth Circuit agreed with the defendant that the second search was unreasonable. *Id.* at 568. The court noted that a search warrant authorizes only one search, and that "a warrant expires once it has been fully executed" and the fruits of the search secured. *Id.* at 568–69, 570 (citing *United States v. Gagnon*, 635 F.2d 766, 769 (10th Cir. 1980)). According to the court, though a search under a lawful warrant may be as long and thorough as necessary, officers may not continue to search once they are satisfied that all the evidence that the warrant authorized them to seize has been located. *Id.* at 571 (citing *United States v. Jackson*, 120 F.3d 1226, 1228–29 (11th Cir. 1997); *United States v. Menon*, 24 F.3d 550, 560 (3d Cir. 1994)). Under this standard, the Sixth Circuit held the second search unreasonable because the government failed to show that "at the time of the second search, the agents possessed a reasonable basis for believing that undiscovered evidence remained in the defendant's home." *Id.* at 572.

Thus, a search—even under a valid warrant—becomes unreasonable when it's no longer supported by probable cause. That is the case here. The deputies searched thoroughly under the search warrant for any sign or remnant of a grow operation and found nothing. And nothing the deputies saw while securing the house gave them probable cause (or even reasonable suspicion) to believe that the Hartes even casually

40

used marijuana.[13] Having concluded that the Hartes hadn't been growing marijuana, probable cause dissipated, and further searching became unreasonable under the Fourth Amendment.[14] The "warrant ha[d] been fully executed," *Gagnon*, 635 F.2d at 769, and deputies no longer "possessed a reasonable basis for believing that undiscovered evidence" that the warrant authorized them to seize was in the Hartes' house, *Keszthelyi*, 308 F.3d at 572.[15]

---

[13] And even if it had, the deputies should not have "rel[ied] on their own discretion," but should instead have refrained from continuing to search "until a neutral magistrate determined that probable cause continued to exist." *Bowling*, 900 F.3d at 933. The deputies never claimed that a magistrate would have authorized them to continue searching the Hartes' house after learning of the tomato-grow operation, and I don't think a magistrate would have done so.

[14] Judge Moritz concludes in her separate opinion that, because the Hartes asserted that the deputies exceeded the scope of the warrant by searching for evidence of general criminal activity, they abandoned their dissipation claim on appeal. *See* Moritz Op. at 12–3. But I interpret the Hartes' argument on appeal to include the claim that the deputies' probable cause dissipated. I disagree that the Hartes conceded that the deputies could search for personal-use marijuana. *Id.* They explicitly dispute the deputies' authority to continue searching after they concluded they would find no marijuana-grow operation, and take issue with the fact that Sergeant Reddin told them to keep searching even after they reported that they found nothing despite searching the house thoroughly. And as I have demonstrated, the deputies' probable cause to search for personal-use marijuana was moored to their probable cause to search for a grow operation. So, even if the warrant initially permitted the deputies to search for evidence of personal-use marijuana connected to a marijuana-grow operation, the Hartes argue—and I agree—that this permission terminated when the probable cause supporting the warrant dissipated.

[15] In fact, the deputies themselves seemed to doubt whether they still had probable cause to continue searching because they felt the need to explain to their supervisor, Sergeant Reddin, that "all we have is a full on hydroponic grow operation that appears to have tomato plants in it." Appellant's App. at A639.

41

The deputies fail to credibly explain why they continued to search after that time. They claimed to be searching for evidence of a hidden room or another grow operation, but they also admitted that they had never encountered a house with a hydroponic tomato grow *and* a separate, hydroponic marijuana grow. Moreover, the photos of the Hartes' hydroponic grow reveal that their basement is unfinished, strongly suggesting that the basement contained no hidden room. The deputies simply ignored strong evidence that their hydroponic marijuana-grow dragnet had ensnared hydroponic vegetable gardeners.

These obstacles meant that the deputies could not continue to search for "any kind of criminal activity" in the house. Appellant's App. at A572. Even if the deputies were searching for only marijuana-related criminal activity, their general rummaging through clothing drawers and other personal spaces disregarded the fundamental rule that "when it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013). We must remember that the Fourth Amendment protects "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Id.* (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). In sum, the Hartes presented sufficient evidence to show that the deputies violated the Fourth Amendment's reasonableness requirement by continuing to search after probable cause had dissipated. Because at least some length of the search was unreasonable, and officers can detain occupants of a house only while the search remains proper under the

42

warrant, *Summers*, 452 U.S. at 705, the Hartes' continued detention was also unreasonable.

## 2. Clearly Established Law

Even though the deputies violated the Hartes' Fourth Amendment rights by unreasonably continuing to search after probable cause had dissipated and by unreasonably extending the Hartes' detention, I cannot say that the deputies violated clearly established law. The Hartes point to no cases sufficiently close to this one in which a court has held that the search violated the Fourth Amendment. And the deputies' unreasonably prolonging the search was not so egregious that every reasonable officer would know that the conduct violated the Fourth Amendment.

The Hartes define the right to be free from unreasonable searches and seizures too generally. It's axiomatic that the Fourth Amendment prohibits general warrants. *See Riley v. California*, 134 S. Ct. 2473, 2494 (2014). But the Hartes can't simply claim that the deputies violated their right to be free from unreasonable general warrants—that right is defined far too broadly.[16] *See Mullenix*, 136 S. Ct. at 308. Here, we must inquire into a narrower question—whether clearly established law provides that continuing a search based on a similar search warrant once probable cause has dissipated violates the Fourth Amendment.

---

[16] Again, it's the Hartes' burden to show that the right they're asking us to vindicate is clearly established. Despite a deputy's statement that "[e]verybody was looking for any kind of criminal activity" in the house, Appellant's App. at A572, the officials were searching only in places where they reasonably expected to find evidence of marijuana.

43

The Hartes correctly remind us that the "prohibition on 'wide-ranging exploratory searches' beyond the scope of the warrant has been clearly established since 1791." Appellant's Opening Br. at 46 (quoting *Garrison*, 480 U.S. at 84). But *Garrison* held that an officer *reasonably* searched an apartment that wasn't included in the warrant because he mistakenly believed it was part of the apartment that the warrant *did* describe. 480 U.S. at 88–89. Here, the warrant particularly described the place to be searched and the things to be seized: the Hartes' house and evidence of a marijuana-grow operation.

And neither *Bowling* nor *Keszthelyi* concerned the question of when probable cause dissipates in the course of a single search under an initially valid search warrant. In both of those cases, officers conducted multiple searches of the same property based on the same probable cause. *Bowling*, 900 F.2d at 929; *Keszthelyi*, 308 F.3d at 563. Though they are relevant to the analysis of dissipating probable cause, they don't clearly establish that the deputies' probable cause dissipated after they determined the Hartes were not, and hadn't recently been, growing marijuana.

Similarly, though I found a Fourth Amendment violation based on an unreasonable search for a marijuana-grow operation in *Cassady v. Goering*, 567 F.3d 628 (10th Cir. 2009), the deficiencies of the warrant and overall unreasonableness of the search in that case were far more egregious than the circumstances before us today. Under § 1983, Mr. Cassady sued the sheriff who had directed the search, alleging in part that the search was overbroad and its execution unlawful. *Cassady*, 567 F.3d at 633. The warrant permitted the officers to seize "[a]ny & all" narcotics

44

and illegal contraband, as well as "all other evidence of criminal activity." *Id.* at 635. The officers found a large marijuana-grow operation on Mr. Cassady's farm. *Id.* at 632. In executing the search warrant, the officers ransacked Mr. Cassady's house and damaged much of his property, including areas that weren't involved in the marijuana grow. *Id.* at 633. We concluded that the warrant and search violated Mr. Cassady's clearly established right to be free from unreasonable searches under the Fourth Amendment, and denied the sheriff qualified immunity. *Id.* at 644.

Here, the warrant didn't permit the deputies to search for any and all evidence of any criminal activity (although it did allow them to search for drug paraphernalia used to introduce any type of drug into the body), and the Hartes don't allege that the deputies damaged their property or ransacked their house, or even that the deputies searched in places where they couldn't find marijuana. So *Cassady* doesn't clearly establish that the deputies' search was unreasonable.

Though *Bowling*, *Keszthelyi*, and *Cassady* lend some support to the theory underlying the Hartes' claim, they aren't factually similar enough to put the "constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741). After the deputies realized that the Hartes hadn't committed the crime described in the search-warrant affidavit—growing, harvesting, and processing marijuana—they didn't immediately stop searching. And despite having secured the house and looked for another grow operation, the deputies had not come across any evidence that the Hartes were using any marijuana, processed or otherwise (or had committed any other crime). But instead of stopping their search, they

45

"switched just a little bit," and continued searching for evidence of a separate crime for which they did not have probable cause—personal use of marijuana. Appellant's App. at A639. But I still can't say that every law-enforcement officer would have known that searching for evidence of personal marijuana use or possession was unreasonable when probable cause to search for a marijuana-grow operation had initially existed but dissipated during the search.

To support their unreasonable-detention claim, the Hartes point to *Summers*. But *Summers* held that because officers had reasonable suspicion to search a residence for contraband, they had the inherent authority to detain the occupants during the search. 452 U.S. at 705. Though the Court briefly noted that "special circumstances, or possibly a prolonged detention, might" be unconstitutional in some cases, it also said that the "routine detention of residents of a house while it was being searched for contraband pursuant to a valid warrant is not such a case." *Id.* at 705 n.21. The Hartes haven't presented evidence sufficient to show that their detention wasn't "routine," or that the warrant was unsupported by probable cause.

They also cite *Muehler v. Mena*, 544 U.S. 93 (2005), to support their claim that a two-and-a-half hour detention is unreasonably long. In *Muehler*, law-enforcement officers had a valid warrant to search a residence, and they detained its occupants in handcuffs for two to three hours. 544 U.S. at 98. The Court found this detention "plainly permissible." *Id.* Though the Court stated that "[t]he duration of a detention can, of course, affect the balance of interests under *Graham* [*v. Connor*, 490 U.S. 386 (1989)]," it still concluded that the "2- to 3-hour detention in handcuffs

46

in this case does not outweigh the government's continuing safety interests." *Id.* at 100. The Court ultimately declined to address whether the detention "extended beyond the time the police completed the tasks incident to the search" because the Ninth Circuit had also declined to address it.[17] *Id.* at 102. But because no case sufficiently close to this one fully advised the deputies that their continued searching and their continued detention of the Hartes would violate the Fourth Amendment, I cannot say that they violated clearly established law.

The Hartes make a colorable claim that the deputies violated clearly established law by unreasonably detaining their young children during the search. Though it's clear that the deputies didn't violate the Fourth Amendment by detaining Mr. and Mrs. Harte during the search, reasonable law-enforcement officers might see no need to detain the children. But we find no case clearly establishing this principle such that the question is "beyond debate." *al-Kidd*, 563 U.S. at 741.

In *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1183–84 (10th Cir. 2001), a SWAT team executing a search and arrest warrant detained at least three children—ages four, eight, and fourteen—at gunpoint. We held that pointing firearms at children and "continuing to hold [them] directly at gunpoint after the officers had gained complete control of the situation . . . was not justified under the circumstances at that point. This rendered the seizure of the children unreasonable, violating their

---

[17] And on remand, the Ninth Circuit did conclude that the detention extended beyond the search. *Mena v. City of Simi Valley*, 156 F. App'x 24, 25 (9th Cir. 2005) (unpublished).

47

Fourth Amendment rights." *Holland*, 268 F.3d at 1193. In reaching this conclusion, we cited *Baker v. Monroe Township*, 50 F.3d 1186 (3d Cir. 1995), and *McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992). In both of those cases, the courts found it unreasonable for police officers to detain children by holding them at gunpoint with no evidence that the children posed any threat. *Holland*, 268 F.3d at 1192 (citing *Baker*, 50 F.3d at 1193; *McDonald*, 966 F.2d at 294).

We further concluded that the law prohibiting the officers' conduct was clearly established: "We can find no substantial grounds for a reasonable officer to conclude that there was legitimate justification for continuing to hold the young people outside the residence directly at gunpoint after they had completely submitted to the SWAT deputies' initial show of force . . . ." *Id.* at 1197. Because "the officers' mistake as to what the law requires was unreasonable under all of the circumstances," we denied them qualified immunity. *Id.* But the key to this conclusion was that the officers continued to aim loaded firearms directly at the children rather than "simply holding the weapon in a fashion ready for immediate use." *Id.* at 1193.

These cases, though relevant to the Hartes' claim, do not clearly establish that the deputies' conduct toward the Hartes violated the Fourth Amendment. The Hartes allege that one of the deputies pointed an assault rifle at Mr. Harte while he was lying on the ground. They do not claim that any of the deputies pointed their firearms at the children, only that the children were unnecessarily detained under armed guard and were frightened by the deputies and their guns. Though detaining the children instead of letting Mrs. Harte take them to school seems unnecessary, no case holds that

48

detaining harmless children under armed guard during a search of their house is objectively unreasonable. At least initially, the deputies had probable cause to search the house and detain Mr. and Mrs. Harte. *See Summers*, 452 U.S. at 704–05. Practical concerns dictate that law-enforcement officers must be allowed to detain children with their parents to monitor the children and ensure that no one interferes with the search.

In sum, the Hartes haven't presented evidence sufficient to establish that the deputies violated clearly established law by searching for any evidence of marijuana after determining that the Hartes weren't growing marijuana, and by detaining the family under armed guard for two-and-a-half hours.

## C.    Excessive Force

### 1.    Constitutional Violation

I next address the Hartes' claim that the agents used excessive force in executing the search warrant. We evaluate excessive-force claims under the Fourth Amendment's objective-reasonableness standard. *Graham*, 490 U.S. at 395. We balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against" the government's interests. *Id.* at 396. In doing so, we must evaluate the totality of the circumstances. *Garner*, 471 U.S. at 9. Our inquiry is heavily fact specific. Factors relevant to this analysis include the severity of the crime at issue, whether the suspect poses a safety threat, and whether the suspect attempts to flee or resists arrest. *Graham*, 490 U.S. at 396. And we examine the

49

reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene." *Id.*

Here, we must ask whether the seven deputies violated the Hartes' Fourth Amendment right to be free from the use of excessive force by wearing bulletproof vests and carrying firearms and a battering ram to execute a warrant on a family with no criminal history in an ordinary residential neighborhood. Though "[t]he Fourth Amendment reasonableness analysis is not limited to the three *Graham* factors," I choose to start with those factors. *Estate of Redd ex rel. Redd v. Love*, 848 F.3d 899, 908 (10th Cir. 2017). I conclude that they weigh heavily in the Hartes' favor.

First, I acknowledge that the crime at issue—growing marijuana—can be considered severe. But the Hartes correctly point out that Kansas law makes possessing marijuana a misdemeanor. Kan. Stat. Ann. § 21-5706(b)(3), (c)(2)(A). They also point out that marijuana possession isn't a crime by some states' laws, including neighboring Colorado's. While this is true, *growing* more than four marijuana plants is a felony. *Id.* §§ 21-5705(d)(7)(A), 65-4105(d)(16). Still, this factor favors the Hartes. If they were growing marijuana at all, the evidence suggested small quantities. Trooper Wingo observed Mr. Harte leaving a hydroponic-gardening store just once carrying a small bag, and the three weeks of trash pulls revealed at best a couple of handfuls of wet vegetation.

Second, the Hartes posed no safety threat. The deputies contend that they couldn't have known the Hartes posed no safety threat, and claim that "[f]rom the officer's [sic] perspective, they were serving a felony narcotics warrant with little to

50

no knowledge about the occupants other than their names, where they lived, and that they likely grew marijuana." Appellee Sheriff's Office's Response Br. at 41–42. But this lack of knowledge was their own fault. The deputies could easily have investigated the Hartes' backgrounds. They would have learned that the Hartes had no criminal history and were former CIA employees. They would also have learned that Mrs. Harte is a practicing attorney and that Mr. Harte had become a stay-at-home father.

Finally, nothing suggested that the Hartes might resist arrest. As discussed above, they had no criminal history, and, at best, had harvested a small amount of marijuana in three weeks. The deputies had no reason to believe that the Hartes would attempt to flee or actively resist the arrest or search.

The deputies contend that the circumstances justified their actions and that the force they used wasn't excessive. Indeed, officers can act to protect themselves. *Lawmaster v. Ward*, 125 F.3d 1341, 1349 (10th Cir. 1997). And the search gave them the right to detain the Hartes and to use reasonable force for that detention. But the deputies still had no reason to believe they would need to protect themselves from the Hartes.

Still, the deputies argue that *Holland* shows that they didn't use excessive force. In *Holland*, we held that the decision to send a seven-person SWAT team wearing hooded, camouflage clothing, along with three uniformed officers, to execute a nighttime search warrant wasn't objectively unreasonable. 268 F.3d at 1183, 1197. But the Fourth Amendment reasonableness inquiry always depends on

51

the totality of the circumstances. *Garner*, 471 U.S. at 9. In *Holland*, the deputies expected to find an unknown number of people besides the suspect at the suspect's residence, they believed that the suspect had violently assaulted another person, and the officers anticipated that they would find firearms at the residence. *Id.* at 1191. Though the deputies here didn't send a SWAT team to execute the warrant, and they weren't wearing "helmets, hoods, kneepads or camouflaged clothing," this hardly makes their conduct reasonable under *Holland*. Appellant's App. at A132. Had the deputies done some homework, they would have learned that no one in the Harte family posed any risk of violence. Moreover, in *Holland*, we said that the decision to send a SWAT team to execute a warrant was reasonable under the circumstances, but we ultimately held that the officers weren't entitled to qualified immunity on the excessive-force claim. *Id.* at 1191, 1197.

I conclude the same here. Taking the facts most favorably for the Hartes, as required, presents an alarming scene. The deputies arrived with a battering ram at the ready, banged and screamed for the Hartes to open the door, forced Mr. Harte to lie down on the floor, held an assault rifle over him,[18] "flooded the foyer" of the Hartes' house, and ordered Mrs. Harte and the Hartes' two children to sit cross-legged against the wall. Appellant's App. at A104. Deputies then restricted the Hartes to

_____

[18] In their brief, the Hartes say that Deputy Kilbey pointed his assault rifle at Mr. Harte. But Mr. Harte testified that he didn't remember which direction the assault rifle was pointing. The district court found that the Hartes conceded that no deputy had pointed a weapon at them. The sole evidence that Deputy Kilbey pointed an assault rifle at Mr. Harte was Mrs. Harte's statement that she saw a deputy "holding an assault rifle over [her] husband." Appellant's App. at A729.

52

their living room under armed guard for the duration of the search. Even though they knew that the Hartes' children would be home at that time, they nevertheless chose to execute the search warrant before school started. And then they wouldn't let either of the Hartes bring the children to school, nor would they let a neighbor take the children to school. Finally, as the deputies were leaving, they told the Hartes they should "have a sit-down" and "just be honest with each other and talk about . . . drug use," implying that their thirteen-year-old son was using marijuana. Appellant's App. at A634.

Considering the lack of danger the Hartes posed to the deputies, their tactics were unreasonably extreme. *See Graham*, 490 U.S. at 396. That the deputies never physically touched or injured any of the Hartes, and that the deputies may not have pointed their guns at any of the Hartes, doesn't convince me otherwise. Because the deputies had no reason to think that the Hartes posed a threat, the circumstances simply didn't justify the overwhelming force. Indeed, if permitted here, such conduct will be routinely permissible. Thus, the Hartes have presented enough evidence to show that the Sheriff's Office's tactics violated the Hartes' Fourth Amendment rights to be free from the use of excessive force.[19]

### 2. Clearly Established Law

---

[19] On this narrow point—whether the deputies used excessive force in executing the Hartes' search warrant—I agree with Judge Lucero. *See* Lucero Op. 15–19. We disagree only on whether the law establishing this violation was clearly established.

In spite of this holding, I see no existing precedent that would have put it beyond debate that the deputies were using excessive force in executing their search warrant. "[T]he right to arrest an individual carries with it the right to use some physical coercion to effect the arrest." *Holland*, 268 F.3d at 1192. The same goes for searches—law-enforcement officers may reasonably display their weapons to gain control of a situation. *Id.* at 1192. "The display of weapons, and the pointing of firearms directly at persons . . . should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time." *Id.*

The Fourth Amendment protects against more than just physical injury flowing from the use of excessive force; it protects "liberty, property and privacy interests—a person's sense of security and individual dignity." *Id.* at 1195. We have observed that many excessive-force cases have proceeded absent allegations of physical injury. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971); *Holland*, 268 F.3d at 1195. Even so, not every reasonable law-enforcement officer would know that what the deputies did here violated the law. *See al-Kidd*, 563 U.S. at 741.

The deputies' conduct didn't reach the level of conduct we have condemned in previous cases. In *Holland*, we emphasized that the deputies had no justification for pointing their weapons at children. *Holland*, 268 F.3d at 1193. We reached a similar conclusion in *Maresca v. Bernalillo County*, 804 F.3d 1301, 1313 (10th Cir. 2015). In *Maresca*, police officers pulled over a family on the side of the highway under the

mistaken belief that the family's vehicle was stolen. *Id.* at 1304. They pointed their guns at the vehicle and ordered each family member to step out of the car, walk backwards towards the officers with hands in the air, and lie face-down with feet in the air. *Id.* at 1305. They handcuffed the family members and kept their guns pointed at each family member, including at least two of the children. *Id.* at 1305–06.

We held that fact questions remained before we could determine whether the officers had used excessive force. *Id.* at 1313–14. Specifically, we concluded that the officers would not be entitled to qualified immunity for their conduct of continuing to point their guns directly at the two children even *after* every single family member (except, perhaps, the nine-year-old daughter) had cooperated with the officers and was lying face-down and handcuffed on the side of the highway. *Id.* at 1314–15 ("Pointing a firearm directly at a child calls for even greater sensitivity to what may be justified or what may be excessive under all the circumstances." (quoting *Holland*, 268 F.3d at 1193)).

Again, the deputies here never pointed their weapons directly at the Harte children. Even if one deputy pointed an assault rifle at Mr. Harte, he must have done so briefly, because Mr. Harte went to the living room with the rest of the family to wait. And though I find it unreasonable to send seven deputies dressed in bulletproof vests, one displaying an assault rifle and the rest displaying pistols, to execute a warrant for a suspected small-time marijuana grow against a family with no criminal history, I can't say that *every* reasonable official would necessarily know that this conduct amounts to excessive force. *See, e.g.*, *Bailey v. United States*, 133 S. Ct.

55

1031, 1038 (2013) ("'[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence,' and '[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.'" (second alteration in original) (quoting *Summers*, 452 U.S. at 702–03)). The cases that the Hartes cite don't persuade me otherwise. Therefore, I would affirm the district court's grant of summary judgment in favor of the deputies.

## III.   *Monell* **Claim**

The Hartes also claim that Johnson County and Sheriff Denning are liable under 42 U.S.C. § 1983 for failure to properly train and supervise the deputies. Specifically, they allege that "the botched investigation and raid on the Hartes occurred as part of a multi-year scheme that was, essentially, a publicity stunt." Appellant's Opening Br. at 53. The district court rejected the Hartes' argument and granted Sheriff Denning and Johnson County summary judgment, reasoning that the absence of an underlying constitutional violation precluded liability under *Monell*. *Harte*, 151 F. Supp. 3d at 1194.

We review de novo the propriety of summary judgment for Johnson County and Sheriff Denning, viewing the evidence in the light most favorable to the Hartes. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 766 (10th Cir. 2013). We must grant summary judgment if these defendants show that there is no genuine dispute on any material fact and they are entitled to judgment as a matter of law. *Id.* I first address Sheriff Denning's liability, and then Johnson County's.

56

Because I held above that the Hartes failed to present evidence sufficient to show that the deputies lacked probable cause, the constitutional violations relevant to the *Monell* claim are the unreasonable search and the use of excessive force.

### A.    Sheriff Denning

Sheriff Denning didn't participate in executing the search warrant, so to succeed on their failure-to-train or failure-to-supervise claims, the Hartes must show more than that Sheriff Denning was in charge of the deputies who investigated the Hartes and searched their house. *See Dodds v. Richardson*, 614 F.3d 1185, 1194 (10th Cir. 2010). They must show that "(1) [Sheriff Denning] promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Id.* at 1199. We have also phrased these requirements as "(1) personal involvement; (2) sufficient causal connection, and (3) culpable state of mind." *Schneider*, 717 F.3d at 767 (quoting *Dodds*, 614 F.3d at 1195).

Here, the Hartes fail to present evidence sufficient to show that Sheriff Denning caused their constitutional deprivations and "acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds*, 614 F.3d at 1199. In his deposition, Sheriff Denning repeatedly testified that he was unaware of the specific details regarding the Harte investigation and search until after the search took place. He also repeatedly explained that his department didn't require officers to send field-tested samples to the crime lab because Kansas law provided that KN-

reagent field tests were sufficient to establish probable cause during the preliminary stages of investigations and proceedings. The Hartes did present evidence that Sheriff Denning knew of and supported the policy of targeting marijuana growers on April 20. But this policy alone doesn't violate any rights—if properly implemented, executing several warrants on the same day isn't inherently unlawful. Finally, Sheriff Denning explained that certain Sheriff's Office policies suggested that some of the deputies' actions, such as failing to develop a safety plan and executing the warrant without determining whether the children had left the house, actually *violated* department protocol.

At most, the Hartes could argue that Sheriff Denning is liable for allowing local law-enforcement agencies to target marijuana-grow operations on April 20, failing to review every single "4/20" search warrant and investigation to be sure that it complied with protocol, and permitting law-enforcement officers to apply for search warrants based on two positive field-test results from field-test kits that Kansas law expressly provided were reliable.[20] As none of these policies had anything to do with the deputies' conduct in executing the warrant, the Hartes have failed to show that Sheriff Denning caused the deputies' use of excessive force or their unreasonable search.

### B.     Johnson County Sheriff's Office

---

[20] Because I conclude that probable cause supported the search warrant, I decline to address whether Sheriff Denning or Johnson County could be liable under § 1983 for any deputy's conduct in procuring the search warrant.

To survive summary judgment on their *Monell* claim against Johnson County, the Hartes must first "identify a municipal 'policy' or 'custom' that caused" their injuries. *Dodds*, 614 F.3d at 1202 (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997)). Then they must present evidence sufficient to show that the "municipal action was taken with the requisite degree of culpability and must demonstrate a *direct causal link* between the municipal action and the deprivation of federal rights." *Id.* (quoting *Brown*, 520 U.S. at 404). The Hartes have a high burden: they must "show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider*, 717 F.3d at 769. And "the challenged policy or practice must be 'closely related to the violation of the plaintiff's federally protected right.'" *Id.* at 770 (quoting Martin A. Schwartz, *Section 1983 Litigation Claims & Defenses*, § 7.12[B] (2013)).

The Hartes have failed to meet either of the two requirements to establish municipal liability. As established above, the only official policies that the Hartes alleged caused them injury were (1) searching suspected marijuana-grow operations on April 20, and (2) allowing the deputies to apply for a search warrant based on the positive results of two field tests of wet vegetation that deputies found in the Hartes' trash.[21] Quite simply, the Hartes didn't claim that the Sheriff's Office had a policy or

_____

[21] Again, neither of these policies is inherently unlawful, and neither would inevitably lead to constitutional injury. As to the first policy, the deputies waited until March to start planning the April 20 day of searches, and the deputies refused to wait until the Hartes' children had left the house to execute the search warrant. If any "4/20" policy existed, it surely didn't mandate procrastination or sloppy

59

practice of exceeding the scope of its search warrants or using excessive force when executing warrants, and nothing in the record attributes the deputies' aggressive and intimidating conduct or their exploratory rummaging to an official policy. Thus, I would affirm the district court's dismissal of the Hartes' claims against Sheriff Denning and Johnson County. I now turn to the Hartes' state-law claims.

## IV.     State-Law Claims

The Hartes brought several state-law claims in addition to their § 1983 claims, including trespass, assault, false arrest, abuse of process, intentional infliction of emotional distress, and false light invasion of privacy. The district court exercised its supplemental jurisdiction under 28 U.S.C. § 1367 and granted the deputies summary judgment on each claim. On appeal, the Hartes addressed only the trespass, assault, false-arrest, and intentional-infliction-of-emotional-distress claims, so I limit my analysis to those claims as well. I agree with the district court on the trespass and

---

investigation. Regarding the second policy, Kansas law permitted officials to rely on field-test results to establish probable cause in situations similar to obtaining a search warrant, and Sheriff Denning implied that this law dictated the Sheriff's Office's internal policies. The Hartes presented evidence that at least one "4/20" search warrant from the previous year had yielded only a tomato grow. But they presented no evidence about whether that search warrant was obtained based solely on field-test results, so we can't infer that the Sheriff's Office knew that this specific practice would lead to unreasonable searches. Even if the law didn't permit reliance on field tests for probable cause, or only allowed such reliance when specially trained officials performed the field tests, I have previously established that probable cause supported the search warrant here. Because the deputies had probable cause, the Sheriff's Office can't be liable for a violation of the Fourth Amendment's prohibition on unreasonable searches.

assault claims, but would reverse on the claims of intentional infliction of emotional distress and false arrest.

### A.    Trespass

The Hartes claim that the deputies trespassed on their property by entering the house without authorization. *See Armstrong v. Bromley Quarry & Asphalt, Inc.*, 378 P.3d 1090, 1092 (Kan. 2016) ("[A] trespasser is one who enters the premises of another without any right, lawful authority, or express or implied invitation or license."). But the search warrant permitted the deputies to enter the Hartes' house. *Harte*, 151 F. Supp. 3d at 1195–96 (citing Restatement (Second) of Torts § 210 cmt. h (1965)). Because I agree with the district court that the search warrant was valid, I also agree with its order granting the deputies summary judgment on the trespass claim.

### B.    False Arrest

The Hartes also claim that the deputies falsely arrested them. "In an action for false arrest . . . all that is necessary is that the individual be restrained of his liberty without any sufficient legal cause therefor, and by words or act which the one being restrained fears to disregard." *Thompson v. Gen. Fin. Co.*, 468 P.2d 269, 280 (Kan. 1970). Because I conclude that the deputies' probable cause dissipated and that their search became unreasonable under the Fourth Amendment, I also conclude that the Hartes' continued detention became unreasonable under *Summers*. Therefore, in my view, the Hartes have presented sufficient evidence to meet the elements of false

arrest, and I would reverse the district court's order granting the deputies summary judgment on this claim.

## C. Assault

I conclude above that the Hartes submitted evidence sufficient to show that the deputies used excessive force. But this doesn't mean under Kansas law that the deputies assaulted the Hartes. In Kansas, assault is "an intentional threat or attempt, coupled with apparent ability, to do bodily harm to another, resulting in immediate apprehension of bodily harm. No bodily contact is necessary." *Baska v. Scherzer*, 156 P.3d 617, 622 (Kan. 2007) (quoting Pattern Instructions for Kan. Civ. 3d 127.01). "The gravamen of a civil assault . . . is grounded upon the actor's intention to inflict injury." *Id.*

The Hartes' claim for assault fails because they can't show that the deputies *intended* to threaten them or attempted to injure them. *Id.* Rather, the deputies intended to take control of the situation and conduct their search.[22] The Hartes' assault claim fails unless we credit their account that overzealous deputies wanted to barge into the Hartes' house to threaten them or attempt to injure them. But if the deputies believed the Hartes were growing marijuana, then they likely brought their

---

[22] In their brief, the Hartes contend that the deputies timed their raid for when the children were home. But later they say that Sergeant Reddin "wanted to execute the search before [the children] left for school *in order to maximize the possibility that Bob and Addie would be home 'before they le[ft] for work.'*" Appellant's Opening Br. at 15 (alteration in original) (quoting Appellant's App. at A543) (emphasis added). This doesn't show that the deputies intended to threaten the children.

weapons to protect themselves rather than to threaten, harm, or even frighten the Hartes—even though doing so was unreasonable under the circumstances. True, the deputies' beliefs turned out to be mistaken, and further investigation would have allayed reasonable fears of danger. But this doesn't convert their actions into assault. *Baska*, 156 P.3d at 622. The Hartes didn't present evidence sufficient to create a genuine dispute of material fact that the deputies intended to threaten or harm the Hartes. The deputies sought only to uncover a marijuana-growing operation.

Thus, because I conclude that the Hartes failed to present evidence from which a jury could find that the deputies intended to harm or to threaten them, I would affirm the district court's order granting summary judgment on this claim.

### D.     Intentional Infliction of Emotional Distress

To prove intentional infliction of emotional distress, the Hartes must show (1) that the deputies acted intentionally or with reckless disregard for the Hartes' well-being; (2) that the deputies' conduct was extreme and outrageous; (3) a causal connection between the deputies' conduct and the Hartes' mental distress; and (4) that the Hartes' mental distress is extreme and severe. *Roberts v. Saylor*, 637 P.2d 1175, 1179 (Kan. 1981). The Hartes have to show that the deputies' actions were "so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and . . . [be] utterly intolerable in a civilized society." *Id.*

The district court concluded that, because the defendants violated no constitutional rights in executing the search warrant and that the force they used was reasonable for Fourth Amendment purposes, the Hartes also failed to meet their

63

burden on this claim. I disagree. The Kansas Supreme Court has said that plaintiffs can show intentional infliction of emotional distress when telling an "average citizen" what happened would "arouse resentment against the actor, and lead that citizen to spontaneously exclaim, 'Outrageous!'" *Taiwo v. Vu*, 822 P.2d 1024, 1029 (Kan. 1991) (quoting *Roberts*, 637 P.2d at 1179).

The deputies' conduct here could and did elicit such a response. And Kansas has clarified that "it is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery . . . and [if] reasonable men may differ, the question is for the jury to determine." *Id.* at 1028 (quoting *Dawson v. Assocs. Fin. Servs. Co. of Kan., Inc.*, 529 P.2d 104, 113 (Kan. 1974)) (emphasis omitted) (alteration in original). Because reasonable men may differ and the Hartes presented evidence that all four family members have been diagnosed with post-traumatic-stress disorder, I would vacate the district court's order granting the deputies summary judgment on this claim.

16-3014, Harte v. Board of County Comm'rs

**MORITZ**, J.

Seven deputies from the Johnson County Sheriff's Office (JCSO) entered and searched the Harte family's residence pursuant to a warrant.[1] The Hartes brought this action to redress their alleged injuries arising from that incident. In my view, several of the Hartes' claims involve fact questions that only a jury can decide. Accordingly, I would partially reverse the district court's order granting summary judgment in favor of the deputies.

A judge issued a warrant to search the Harte residence based on Deputy Mark Burns' representations that (1) he "field tested a sample of the plant material" obtained from the Hartes' trash; and (2) the tests "showed a positive response for the presence of THC." App. 708. At the summary-judgment stage, the Hartes contested the second fact, asserting that Deputy Burns "falsely reported that the field tests were positive." Supp. App. 118.

If the Hartes' version of the facts is true, the deputies violated the Fourth Amendment. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978); *Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir. 1990); *Snell,* 920 F.2d at 699 (explaining that "entry and search of a residence on the basis of known false allegations violate[s] the [F]ourth [A]mendment's proscription against unreasonable searches and seizures"). And because the deputies have failed to demonstrate that there exists no genuine dispute of material fact, I would conclude that the district court partially erred in entering summary judgment

---

[1] I adopt, in general, the facts set forth in Judge Phillips' separate opinion. *See* Phillips Op. 2-11. I also provide additional facts as needed.

for the deputies on the Hartes' *Franks* claims. Further, because the district court assumed the warrant's validity in entering summary judgment on those claims, I would also hold that the district court erred in granting summary judgment on the Hartes' wrongful search and seizure and state-law claims. But I would find that the district court correctly entered summary judgment on the Hartes' excessive-force and supervisory liability claims.

**I**

During their cursory pre-search investigation of the Hartes' residence, the deputies retrieved three "clump[s] of green vegetation" from the Hartes' trash. App. 548. After discarding the first clump, the deputies allegedly conducted field tests on the second and third clumps. In his warrant application, Deputy Burns averred that tests of both clumps "showed a positive response for the presence of THC." App. 708. Based on those alleged results, Deputy Burns concluded that the green vegetation was "saturated marijuana plant material." *Id.* at 709. We now know that the vegetation was nothing more than discarded tea leaves. Nevertheless, a judge issued a warrant in reliance on Burns' representations.

The Hartes claim that the deputies obtained the warrant through either "deliberate falsehood[s]" or "reckless disregard for the truth." *Franks*, 438 U.S. at 171. Specifically, the Hartes assert three putative *Franks* violations: (1) the deputies lied about the results of the tests; (2) the deputies misinterpreted the test results, construing negative results as positive; and (3) assuming that the deputies actually received positive results, they

2

recklessly disregarded the truth—that the leaves were tea, and not marijuana—by relying solely on inaccurate field tests and failing to conduct a thorough investigation.[2]

**A**

The Hartes' first claim implicates *Franks*' deliberate-falsehood prong. The Hartes allege that the deputies generally, and Deputy Burns specifically, lied about the test results. If that allegation is true, the deputies unquestionably violated the Hartes' clearly established Fourth Amendment rights. *See Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) ("No one could doubt that the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986, in the context of information supplied to support a warrant for arrest."); *Clanton v. Cooper*, 129 F.3d 1147, 1154 (10th Cir. 1997) ("It has long been clearly established that the Fourth Amendment's warrant requirement is violated when 'a false statement knowingly and intentionally . . . was included by the affiant in the warrant affidavit' if the false statement is necessary to a finding of probable cause." (quoting *Franks*, 438 U.S. at 155-56)).

The parties dispute whether Deputy Burns lied in the warrant affidavit. Thus, it's imperative to apply the correct framework for resolving that dispute.

---

[2] Although the Hartes' complaint alleges a *Franks* claim only in broad terms, their summary-judgment and appellate briefing articulate the distinct theories set forth above. I refer to these theories as "claims" throughout.

On appeal, the Hartes also seem to assert a new *Franks* claim: that the deputies never field tested the tea leaves at all, and that they lied about doing so. But the Hartes didn't make this argument below. Nor do they argue for plain-error review on appeal. Accordingly, I decline to consider this alternative *Franks* claim. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130-31 (10th Cir. 2011).

"Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). At the first step in the analysis, this court must determine whether the facts alleged by the Hartes, when viewed in the light most favorable to them, establish a constitutional violation. *See Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015). But mere allegations aren't enough; the Hartes' version of the facts must be "sufficiently grounded in the record." *Cox v. Glanz*, 800 F.3d 1231, 1243 (10th Cir. 2015) (quoting *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J., concurring)); *see Quinn*, 780 F.3d at 1004 (explaining that "plaintiff's factual recitation must find support in the record"). As I discuss below, the Hartes' allegations of lying are supported by record evidence. And as the previous paragraph demonstrates, that version of the facts gives rise to a clearly established *Franks* violation.

Accordingly, the burden shifts to the deputies, "who must prove that 'no genuine issues of material fact' exist." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (quoting *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001)). "In the end, therefore, the defendant still bears the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense." *Id.*

In setting forth this framework, I'm mindful of our precedent indicating that "to survive qualified immunity, a [*Franks*] plaintiff must make a substantial showing of deliberate falsehood." *Snell*, 920 F.2d at 698; *see id.* (explaining that a *Franks* plaintiff must make "a specific affirmative showing of dishonesty by the [warrant] applicant"

4

(quoting *Myers v. Morris*, 810 F.2d 1437, 1458 (8th Cir. 1987)); *see also Franks*, 438 U.S. at 171 (holding that "the challenger's attack must be more than conclusory").

I would find that the Hartes have made the required showing here and that the deputies, in turn, have failed to dispel the existence of a genuine factual dispute. I would further find that the Hartes' allegations of lying are sufficiently grounded in record evidence, and that same evidence creates a triable issue of fact as to whether the deputies lied about the field-test results.

To begin, the record contains chemical evidence that Deputy Burns didn't obtain positive test results for the tea leaves. The Hartes' retained expert, Michael Bussell, tested the exact same samples—using the exact same type of field test the deputies used—and yet obtained very different results: contrary to the deputies' alleged results, Bussell stated that the tea leaves tested negative for the presence of THC. A jury could reasonably infer from those negative results that Deputy Burns lied about obtaining positive results.[3]

The district court disregarded this hard evidence for three reasons. First, the district court noted that the tea leaves were more than three years old when Bussell tested them. The district court reasoned that this fact undermines Bussell's testing because "[t]here is no evidence in the record from which a jury could conclude that the plant

---

[3] In his separate opinion, Judge Phillips suggests that Bussell's negative results don't support the Hartes' allegations because the field test at issue is inaccurate 70% of the time. *See* Phillips Op. 19 n.9. But that 70% figure indicates, based on a single study, how often this test yields false positives for a variety of chemical substances, e.g., vanilla, peppermint, and 40 others. Because the study doesn't indicate how often this test yields false positives specifically for caffeine—the only substance relevant here—the putative 70% inaccuracy rate doesn't support Judge Phillips' position. Indeed, the study's testing yielded an accurate negative result for a caffeine-based coffee flavoring.

5

material was sufficiently the same in terms of its chemical makeup in May 2015 as compared to April 2012." App. 112. But that reasoning wrongly shifts the evidentiary burden away from the deputies, who bear the ultimate burden to show that no factual disputes exist. *See Olsen*, 312 F.3d at 1312. The Hartes came forward with evidence contradicting Deputy Burns' warrant affidavit, and a jury could credit that evidence. The deputies were free to introduce their own evidence regarding the tea leaves' chemical composition, but they didn't do so. In the absence of such evidence, there's no basis for a jury to conclude that the tea leaves *weren't* chemically identical in 2012 and 2015.[4]

Next, the district court noted that Bussell obtained a false-positive result when he tested a batch of freshly brewed tea leaves. In the district court's view, this positive result would preclude a reasonable jury from concluding that Deputy Burns lied about obtaining a positive result in 2012. I disagree. First, as the district court conceded, there's "no evidence" that the 2012 tea leaves were the same type of tea leaves that Bussell brewed in 2015. App. 117. Second, Bussell obtained a positive result by using a field test made by a different manufacturer—and based on a different chemical reagent—from the tests the deputies used in 2012. Notably, when Bussell tested the freshly brewed leaves using the same field test that the deputies used, he obtained a negative result. Perhaps a jury would give some weight to a result obtained from a chemically different field test and a potentially different type of tea. But in my view, that result doesn't preclude the jury

---

[4] On appeal, the deputies replicate the district court's error. They argue that caffeine in the tea leaves triggered a false positive in 2012, and they speculate that the caffeine may have "substantially dissipated" by 2015. Aplee. Br. 28. But the deputies point to no record evidence supporting that speculation.

from crediting the results the Hartes rely on, which involved the same field test and the original tea leaves.

Finally, the district court points to the test results obtained by JCSO's Crime Laboratory (the Crime Lab). Four months after the April 20 raids, the Crime Lab retested the original tea leaves, using the same field test that the deputies used, and obtained a positive result. That's certainly favorable evidence for the deputies. And perhaps a jury would put more stock in a test conducted four months later—albeit by the deputies' own Crime Lab—than in one conducted three years later by an expert the Hartes retained. But in the face of directly contradictory test results, I would conclude that we can't substitute our judgment for a jury's.[5]

In addition to the Hartes' direct evidence that the deputies misrepresented the results of their field tests, the record is replete with circumstantial evidence that the deputies were motivated to obtain a search warrant by whatever means necessary. As Judge Lucero's separate opinion thoroughly and aptly explains, the deputies were "under

---

[5] At trial, several factors could cause a jury to credit Bussell's result over the Crime Lab's. While Bussell extensively filmed, photographed, and documented his testing, the Crime Lab documented its testing in a single-paragraph report. Because interpreting field-test results isn't an exact science, a jury may prefer Bussell's interpretation and explanation of his results—which are supported by pictures and video—to the Crime Lab's written, barebones interpretation of its results. Or a jury may conclude that Bussell's credentials and expertise compare favorably to those of Melinda Spangler, the Crime Lab's technician. These matters of judgment are inherently within the province of a jury. *See Prager v. Campbell Cty. Mem'l Hosp.*, 731 F.3d 1046, 1060 (10th Cir. 2013) ("Having reviewed the pertinent expert testimony, we cannot say with confidence that 'the evidence points but one way,'" and the "question [is] one for the jury to weigh and ultimately decide." (quoting *Wagner v. Live Nation Motor Sports, Inc.*, 586 F.3d 1237, 1244 (10th Cir. 2009))).

enormous pressure to [obtain a warrant] in time to carry out the raids on April 20."

Lucero Op. 13.

This pressure may explain certain anomalies in the deputies' investigation. For instance, as Judge Lucero's separate opinion notes, the deputies retrieved clumps of green vegetation from the Hartes' trash on three separate dates. "[O]n April 3, it was identified as innocent plant material and discarded without testing. As the April 20 deadline approached, however, . . . the [deputies] determined that this previously innocuous material was now suspicious and should be tested for the presence of marijuana." *Id.* at 12. And instead of conducting a thorough investigation—e.g., surveilling the Harte residence, conducting background checks, or reviewing the Hartes' utility usage—the deputies did nothing more than search the Hartes' trash.[6]

A jury may conclude that the same pressure that caused a shoddy investigation also motivated the deputies to manufacture false test results. That evidence, in conjunction with Bussell's negative test result from the same tea leaves, creates a genuine dispute of material fact as to whether the deputies lied about the field-test results. Therefore, I would conclude that the district court erred in entering summary judgment on the Hartes' first *Franks* claim.

---

[6] The Hartes assert that Deputy Burns' failure to photograph the field test results is additional evidence that he lied about the results. But as Judge Phillips' separate opinion explains, Deputy Burns' testimony establishes that it wasn't his practice to photograph test results in these circumstances. *See* Phillips Op. 16-17. Nevertheless, the lack of photographs is significant for a different reason: it deprives the deputies of the kind of evidence that would "blatantly contradict[]" the Hartes' version of the facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). In the absence of such evidence, this is not a case where a plaintiff "asserts that the sun rises in the west and demands a jury trial to resolve the issue." *Olsen*, 312 F.3d at 1313.

**B**

The Hartes' second and third *Franks* claims, in contrast with their first claim, turn on whether the deputies acted with "reckless disregard for the truth" in submitting the warrant affidavit. *Franks*, 438 U.S. at 171. Specifically, the Hartes assert that the deputies (1) misinterpreted the test results, construing negative results as positive; and (2) recklessly disregarded the truth—that the leaves were tea, and not marijuana—by relying solely on inaccurate field tests and failing to conduct a thorough investigation.

I would not decide whether these allegations amount to a constitutional violation because the Hartes have failed to demonstrate that the asserted violations are clearly established. *See Swanson v. Town of Mountain View*, 577 F.3d 1196, 1199 (10th Cir. 2009) (exercising discretion to first determine that the asserted right was not clearly established). True, it has long been clearly established that a warrant is invalid if it contains a "deliberately or reckless[ly] false statement," so long as probable cause is contingent on that statement. *Franks*, 438 U.S. at 165; *see Clanton*, 129 F.3d at 1154. And in Part I.A, I concluded that the law is clearly established with respect to any *deliberately* false statements the deputies made. That's because every reasonable officer would know that lying in a warrant affidavit is unconstitutional. *See Clanton*, 129 F.3d at 1154 ("[Plaintiff] has alleged that [defendant] knowingly and intentionally swore to the veracity of [a third party's] confession, while knowing that confession to be false: a classic *Franks* violation."). Because there's little ambiguity as to what kind of conduct constitutes lying, "existing precedent . . . placed the statutory or constitutional question

9

beyond debate," and "[w]e do not require a case directly on point." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

The term "reckless," on the other hand, is a legal term of art, like "excessive force" or "exigent circumstances." And the Supreme Court has repeatedly admonished us that those terms don't inform reasonable officers what type of conduct is prohibited. *See, e.g.*, *Mullenix v. Luna*, 136 S. Ct. 305, 308-09; *Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might . . . have a mistaken understanding as to whether a particular amount of force is legal in those circumstances."). Accordingly, when determining whether an officer has recklessly disregarded the truth in a warrant application, "the result depends very much on the facts of each case." *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004). The Hartes must therefore "identify a case where an officer acting under similar circumstances as [the deputies] was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017)

The Hartes haven't done so. Their second *Franks* claim alleges that the deputies misinterpreted the test results and construed negative results as positive. But even if the deputies did so, the Hartes don't identify any cases establishing that this kind of conduct is reckless.

Their third *Franks* claim fares no better. The Hartes allege that the deputies recklessly disregarded the truth—that the leaves were tea, and not marijuana—by (1) relying solely on inaccurate field tests and (2) failing to conduct a thorough investigation.

10

Regarding their first allegation, the Hartes cite a single case relating to inaccurate drug tests: *Eaton v. Lexington-Fayette Urban County Government*, 811 F.3d 819 (6th Cir. 2016). There, the court held that "an utterly unreliable—read random—testing procedure might well violate the Fourth Amendment." *Id.* at 822. But even if a lone Sixth Circuit case could define clearly established law in this circuit—a questionable proposition[7]—the court in *Eaton* didn't hold that the drug testing at issue there amounted to a constitutional violation. *See id.* Accordingly, a reasonable officer reading *Eaton* wouldn't know whether relying on faulty field tests violates the Fourth Amendment.

As for their second allegation, the Hartes fail to cite a case establishing that an inadequate investigation amounts to a reckless disregard for the truth. In fact, our cases demonstrate quite the opposite: "The failure to investigate a matter fully, to 'exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence' rarely suggests a knowing or reckless disregard for the truth. To the contrary, it is generally considered to be[]token negligence '*at most*.'" *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994) (quoting *United States v. Dale*, 991 F.2d 819, 844 (D.C. Cir. 1993)).

Because the Hartes' second and third *Franks* claims don't assert clearly established constitutional violations, I would hold that the district court correctly entered summary judgment on those claims.

---

[7] In the absence of a controlling decision by the Supreme Court or the Tenth Circuit, "the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (quoting *Klen v. City of Loveland*, 661 F.3d 498, 511 (10th Cir. 2011)).

11

## II

### A

In light of my conclusion that one of the Hartes' *Franks* claims survives summary judgment, I would also conclude that the Hartes' wrongful search and seizure claims necessarily survive. *See Poolaw v. Marcantel*, 565 F.3d 721, 732 (10th Cir. 2009). And because the district court entered summary judgment on the Hartes' state-law claims based, in part, on its conclusion that there were no *Franks* violations, I would reverse the entry of summary judgment on the four state-law claims at issue on appeal.

### B

In his separate opinion, Judge Phillips concludes that the deputies obtained a valid search warrant. Phillips Op. 14-25. Nevertheless, he concludes that "the deputies violated the Fourth Amendment's reasonableness requirement by continuing to search [the Harte residence] after probable cause had dissipated." *Id*. at 42. Because I would hold that the warrant was invalid under *Franks*, I would decline to decide whether the deputies properly executed the warrant. But even if I agreed that the warrant was valid, I wouldn't reach the Hartes' dissipation theory because they abandoned it on appeal.

In their opening brief, the Hartes devote a scant two paragraphs to their argument that the deputies' search exceeded the scope of the warrant. And nowhere in those paragraphs do they argue—as they did in the district court, *see* Supp. App. 131-32—that probable cause dissipated during the search. Instead, they assert that the deputies exceeded the scope of the warrant by searching for evidence of general criminal activity. *See* Aplt. Br. 44 ("[T]he deputies acted as if they possessed a general warrant and thus

12

violated the Fourth Amendment.").[8] Because the Hartes abandoned their dissipation theory on appeal, I would decline to consider it. *See Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 702-03 (10th Cir. 1998).

## III

Regarding the Hartes' excessive-force claim, I join Part II.C.2 of Judge Phillips' separate opinion. *See* Phillips Op. 53-56. Because I agree that the law in this area isn't clearly established, I would decline to decide whether the deputies' conduct amounts to a constitutional violation. *See Swanson*, 577 F.3d at 1199.

## IV

Finally, the Hartes assert that the department had two policies or customs that give rise to supervisory liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978): (1) JCSO's participation in Operation Constant Gardener; and (2) JCSO's faulty reliance on the KN reagent field tests. The Hartes argue that these policies or customs caused the alleged constitutional violations. I disagree.

My limited resolution of the alleged constitutional violations simplifies this issue. I would only reverse summary judgment as to the Hartes' first *Franks* claim (and the unlawful search and seizure that directly resulted therefrom). That violation is based on the deputies' alleged lies. But the Hartes haven't established "a direct causal link"

---

[8] Judge Phillips' discussion of personal-use marijuana illustrates the distinction between his analysis and the Hartes' argument on appeal. The Hartes tacitly concede that the deputies were permitted to search for personal-use marijuana because the search warrant so authorized. Judge Phillips, in contrast, reasons that the deputies "continued searching for evidence of a separate crime for which they did not have probable cause—personal use of marijuana." Phillips Op. 46.

13

between the policies or customs they assert and the deputies' alleged lies. *See Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

JCSO's participation in Operation Constant Gardener has no causal connection to the violations. True, I reasoned above that the operation may be evidence of the deputies' motivation to lie. But a "direct causal link," *id.*, requires more than that. In *Brown*, the Court held that "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id*. at 405. Accordingly, "[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* at 411. And in this context, mere "but-for" causation is insufficient. *Id*. at 410. It's therefore consistent to hold that pressure from the operation may have motivated the deputies to lie, yet didn't *cause* them to lie for *Monell* purposes.

Nor does JCSO's reliance on the KN reagent field tests have any causal connection to the violations. If Deputy Burns obtained a warrant by lying about the field-test results, the tests' accuracy is irrelevant. Accuracy would matter only if the deputies recklessly relied on false positives. In other words, JCSO's alleged policy of relying on inaccurate tests didn't cause Deputy Burns to lie. Thus, I would affirm the district court's entry of summary judgment on the Hartes' *Monell* claims.

14